598 A.2d 821

Patricia J. MANOWN, Individually, etc.

v.

J. Stephen ADAMS, et al.

No. 88, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Dec. 3, 1991.

504

Howard W. Gilbert, Jr. (Kenneth J. Mackley and Mackley, Gilbert & Marks, on the brief), Hagerstown, for appellant.

Carolyn B. Press (W. Bryan Hall, on the brief), Cumberland, for appellees.

Argued before ROSALYN B. BELL, FISCHER and HARRELL, JJ.

HARRELL, Judge.

This appeal arises out of an action brought by appellee and cross-appellant, J. Stephen Adams, against appellant and cross-appellee, Patricia J. Manown, individually, and trading as North Star Design & Publishing (North Star),[1] to recover funds that he allegedly transferred to her and to the business. In defense, Manown claimed that Adams was coming into court with "unclean hands" and that his action should therefore be barred. The Circuit Court for Washington County refused to do so and after a jury trial judgment was entered against Manown in the amount of $43,000.

The parties raise a number of issues on appeal. Manown's first argument is that the circuit court erred in refusing to invoke the unclean hands doctrine to bar Adams' action against her. We agree. Accordingly, we reverse the judgment and do not consider the other issues presented.

### *Facts*

The ill-starred association between Manown and Adams began in April 1986. Adams had recently separated from his wife and was in difficult financial straits, due at least in part to the failure of a film processing laboratory he owned

---

1. North Star is an unincorporated business licensed in Manown's name.

in Garrett County.[2] Manown was doing sales promotion work for the Ramada Inn in Hagerstown. That summer Manown and Adams vacationed together in Florida, where they devised the idea of starting a business together. It would produce for sale items such as post cards and calendars, and the partners would contribute to the enterprise their respective skills in sales promotion and photography. The idea eventually came to fruition; the business was licensed in Maryland in June 1987 under the name North Star. Manown alone, however, was licensed as its owner. A month later a bank account was opened for the new business. Only Manown's name appeared on the signature card.

Meanwhile, the relationship between the two grew more involved. They had been living together in Manown's townhouse in Hagerstown since September 1986. Manown had also left her job at the Ramada Inn and begun working for Steve Adams Photography, a commercial photography business that Adams had been operating as a sole proprietership for a number of years. In February 1988, the two purchased a house together in Frederick County. The house, like the business, was titled in Manown's name alone, though Adams was in large part responsible for financing the purchase.

While his involvement with Manown was growing, Adams was attempting to extract himself from the personal and financial problems that beset him. After a lengthy series of negotiations, he and his wife agreed to a separation and property settlement on 10 July 1987. They were finallv divorced in September of the same year. He filed a petition for personal bankruptcy on 4 November 1988. He received his discharge in bankruptcy on 21 February 1989.

The transfers of funds that formed the basis of Adams' action in the case *sub judice* began in June 1987 and continued until May or July 1989. Some of the transfers

2. Adams closed the laboratory in September 1986.

were made by Adams directly into North Star's account, ostensibly to finance the business. Others were made to Manown for purposes of financing the purchase of the Frederick County house and paying other expenses related to the house. On 19 February 1988, for instance, Adams turned $43,000 over to Manown for the down payment on the house. The transferred funds did not go solely into North Star and the house, however. Adams also made a number of personal loans to Manown. According to Adams' amended complaint, in total he transferred to Manown and North Star no less than $97,307.29.

The association between Manown and Adams ended in the spring of 1989. Manown moved out of the house in April 1989 and went back to work as a sales promoter, this time for the Sheraton Inn in Hagerstown. Adams vacated the house in July 1989. On 13 October 1989 Manown sold the house. She kept the proceeds. North Star's assets also remained in the possession of Manown.

On 26 June 1989, Adams filed an action against Manown to recover the transferred funds and interest thereon, or, in the alternative, seeking an accounting, liquidation, and distribution of all assets and liabilities (including the Frederick County house) of the "partnership" between Manown and Adams. In defense, Manown claimed that Adams was coming into court with "unclean hands" and that his action should therefore be barred. Manown contended that the transfers had all been made in an effort to hide Adams' assets from his wife, his creditors, and the bankruptcy court. In support of this contention, she pointed to the fact that both the business and the house had been titled in her name alone, despite the fact that the two ran the business and purchased the house together. In addition, she asserted that none of the assets Adams claimed to have transferred to her and to North Star were declared by Adams in either the divorce proceeding or the bankruptcy proceeding, though each had occurred within roughly the same period and though in each proceeding it had been specifically inquired of him whether he had made any such transfers.

On 9 May 1990, after completion of discovery, Manown moved for summary judgment on the basis of her allegations. In support of her motion, Manown proffered materials which included, *inter alia:* (1) Adams' bankruptcy petition file, in which he had declared, under the penalty of perjury, that he had no interest in any property held by another person and that he had made no transfers of any property to another person within the last year, and in which he had failed to list North Star under the heading "Partnerships or businesses engaged in during the 6 years immediately preceding the filing of this petition" or to list, in his Schedule B form ("Statement of All Property of Debtor"), any of the assets he claimed to have transferred to Manown and to North Star; (2) Adams' pleadings in his divorce action, in which he had specifically denied, again under oath, having transferred to any person other than his wife any asset with a value in excess of $100 during their marriage; (3) two letters from Adams to Manown, dated 29 April 1989 and 19 May 1989, in which he had expressed his willingness to go to jail if necessary in order to obtain his money from Manown (the implication being that he was aware that his above described failure to disclose could expose him to criminal liability) [3]; and (4) copies of Adams' deposition testimony, during which he had invoked his constitutional privilege against self-incrimination in response to questions regarding Manown's allegations. [4]

---

**3.** The 29 April 1989 letter stated that "I will either hear from you by letter or phone or I will wait for the guy with the badge to knock on my door. Like I have said before I have had the law knock on my door before. It is very humiliating and degrading but I am ready to handle it." The other letter stated that "I am still willing to pay the price and go to jail."

**4.** Questions Adams refused to answer on this basis included the following:
1. Would it not be correct, Mr. Adams, that none of the loans which are in your suit against [Ms. Manown], none of those are listed in your bankruptcy schedule?
2. [W]hy was the house titled in her name if you put up the $43,000?

Adams did not contest any of Manown's allegations in his response to her motion for summary judgment. Instead, he asserted that the unclean hands doctrine did not apply in actions at law and that Manown's allegations were immaterial to the action.

The circuit court denied Manown's motion for summary judgment on the ground that the unclean hands doctrine did not apply in actions at law. Upon Manown's motion for reconsideration the circuit court altered its reasoning based on Manown's citation of Maryland case law specifically stating that the doctrine *did* apply in actions at law. Again, however, the circuit court denied the motion for summary judgment, this time on the ground that the doctrine's application was a matter for the determination of the factfinder.

In the course of the trial, Adams continued to maintain that Manown's allegations were immaterial to the action. He did not present any evidence contesting the allegations during his testimony upon direct examination. Upon Manown's cross-examination of Adams, however, when Manown's counsel again began questioning him on the subject, he abandoned his former reticence and contended that he had in fact done everything on advice of counsel.

The trial judge ultimately submitted the entire matter to the jury, with instructions that they could, if they so chose, apply the unclean hands doctrine to bar Adams' action if they found that either he alone, or the two of them together, had "participated in fraudulent or illegal conduct contrary to law or public policy or in fraud of the law itself." The jury returned with a general verdict in favor of Adams in the amount of $43,000.[5] This appeal followed.

---

3. The fact that you did not sign any checks for North Star wouldn't have anything to do with the fact that you were filing for bankruptcy?
4. Can you give me any reason why it was decided [in] regard [to] this North Star venture ... that your name would not go into it in any written form?

5. This figure corresponds exactly to the amount stated in Count I of Adams' complaint, which involved the down payment on the house.

## Discussion

 The unclean hands doctrine refuses recognition and relief from the courts to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought. *Hlista v. Altevogt,* 239 Md. 43, 48, 210 A.2d 153 (1965). The doctrine is not for the protection of the parties to a lawsuit, but rather, for the protection of the courts— the idea being that judicial integrity is endangered when judicial powers are interposed to aid persons whose very presence before a court is the result of some fraud or inequity. *Niner v. Hanson,* 217 Md. 298, 309, 142 A.2d 798 (1957). The doctrine also serves another purpose which was stated long ago by the Court of Appeals in a case with facts parallel to this one:

> The suppression of such illegal and fraudulent transactions is far more likely, in general, to be accomplished by leaving the parties without remedy against each other, and thus introducing a preventative check, than by enforcing them at the instance of one of the parties to the fraud[.]

*Roman v. Mali,* 42 Md. 513, 533–34 (1875). Thus, where there is evidence of willful wrongdoing in relation to the controversy before it, the doctrine allows a court to literally wash its hands of the affair, leaving the guilty party or parties to the consequences of their actions.

 Of course, the doctrine is not one of absolutes. "[I]ts limits are ill-defined, and the circumstances under which it may be invoked are necessarily of infinite variety; nor is it possible to lay down an exact rule by which to determine in all cases when the principle is to be acted on." 30 C.J.S. *Equity* § 99 (1965). Accordingly, the question of whether the principle is to be invoked in a particular case rests in the sound discretion of the trial court. *Space Aero*

---

No combination of any of the other counts totals exactly $43,000. As it was a general verdict, however, we cannot say for certain whether the jury actually found for Adams only on Count I.

*Products Co. v. Darling,* 238 Md. 93, 120, 208 A.2d 74 (1965).

Manown alleged that Adams had defrauded both his wife and his creditors by hiding his assets in North Star and in her name, that he had perjured himself in the process, and that the money which he was seeking to recover was the fruit of this conduct. Her motion for summary judgment clearly set forth facts sufficient to warrant the circuit court's barring of the action on the basis of the unclean hands doctrine. *See Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 333, 517 A.2d 786 (1986), *quoting Vanhook v. Merchants Mutual Ins. Co.,* 22 Md.App. 22, 26–7, 321 A.2d 540 (1974) ("The party moving for summary judgment may place before the trial court the facts necessary to a determination for summary judgment (1) by affidavit, (2) by deposition, (3) by answers to interrogatories, (4) by admissions of facts, (5) by stipulation or concession, or (6) by pleadings."). As Adams failed to contest any of these allegations, the circuit court was entitled to rely on them as the truth. *See Castiglione,* 69 Md.App: at 334–35, 517 A.2d 786 (facts alleged in pleadings are before court as facts for purposes of summary judgment where "one party in its pleadings concedes the existence of the only facts material to a resolution of the summary judgment motion" by either admitting or not contesting them). *See also Kramer v. Levitt,* 79 Md.App. 575, 582–87, 558 A.2d 760 (1989), *discussing Baxter v. Palmigliano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (adverse inference may be drawn in civil case from a party's invocation of constitutional privilege against self-incrimination).

The circuit court, of course, was not required to invoke the doctrine at Manown's behest, despite the damning evidence against Adams. As we have already stated, the application of the doctrine rests in the sound discretion of the court. *Space Aero Products,* 238 Md. at 120, 208 A.2d 74. But the circuit court in the case *sub judice* failed to exercise its discretion. Initially, this failure was based

on the circuit court's erroneous belief that the unclean hands doctrine is inapplicable to an action at law, as distinguished from a suit in equity. It is settled in this State, however, that the doctrine may be invoked to bar suits at law and in equity. *See Messick v. Smith*, 193 Md. 659, 669, 69 A.2d 478 (1949) ("when Plaintiff and Defendant have participated in fraudulent or illegal conduct, contrary to law or public policy or in fraud of the law itself and are in *pari delicto*,[6] plaintiff cannot maintain suit—at law or in equity—directly arising out of the misconduct."). *See also Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.*, 214 Md. 18, 133 A.2d 59 (1956) (invoking unclean hands doctrine to bar action at law). This corresponds with the general trend of merging procedures at law and equity. *See* Md. Rule 2–301 (1991) (eliminating distinctions between law and equity procedures). The circuit court subsequently changed its mind, but determined that the question of the doctrine's application ought to be submitted to the jury. This determination was erroneous as well. While the unclean hands doctrine may involve factual questions, its purpose is to protect institutional interests. *Niner*, 217 Md. at 309, 142 A.2d 798. It is therefore the judge, who is capable of identifying such interests and weighing them against other considerations, who must determine when the doctrine should be invoked to bar a claim. As the circuit court failed to exercise its discretion, we cannot, as we normally would, defer to its decision in such a matter.[7]

---

**6.** The term "in *pari delicto* " literally means "equal fault." Contrary to Adams' argument on appeal, in *pari delicto* is merely a cognate principle to the unclean hands doctrine, and not a separate factual element which must be met in order to bar an action. *See Messick*, 193 Md. at 667–671, 69 A.2d 478 (using "in *pari delicto* " and "clean hands" interchangeably). *See also* 30 C.J.S. *Equity* § 94 (1965) ("In *pari delicto* is a corollary of the clean hands doctrine").

**7.** While we have discovered no Maryland case law directly on point, other jurisdictions have generally held that a decision which is vested in a trial court's discretion, but is not made in the exercise of that discretion, is not entitled to deference. *See generally* 4 C.J.S. § 111 (1985).

■ It is of course extremely rare for an appellate court to reverse a trial court's denial of a summary judgment motion after a full trial on the merits. *See Metropolitan Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 415 A.2d 582 (1980). "A court ... possesses discretion to refuse to pass upon or affirmatively deny a motion for summary judgment in favor of a full trial on the merits, even though the technical requirements for summary judgment are met." *Schroyer v. McNeal,* 84 Md.App. 649, 653, 581 A.2d 472 (1990). We are presented here, however, with a situation where the circuit court failed to exercise its discretion because of its misapprehension of the law. It would, therefore, be inappropriate for us to defer to the circuit court's decision on the assumption that, had it actually applied its judgment, it would still have denied the motion. *See supra* n. 7. This is especially so in the instant case since the evidence at the summary judgment stage indisputably established that Adams had engaged in the conduct alleged by Manown.

Moreover, this is not a case where the trial on the merits turned up evidence or resulted in factual findings contrary to what the moving party asserted in her motion for summary judgment. *See Basiliko,* 288 Md. at 29, 415 A.2d 582 ("To turn the tables in this manner would be nothing short of substituting a known unjust result for a known just one."). The only response Adams ever mustered to Manown's allegations was to attempt to establish his own blamelessness by casting the blame for his conduct on his former attorney.

■ It is true that reliance on an attorney's advice may, in a civil action, negate wrongdoing where the advice has been based on a full disclosure of the relevant facts. *See Derby v. Jenkins,* 32 Md.App. 386, 391, 363 A.2d 967 (1976).[8] This rule allows lay people to rely on an attorney's

---

**8.** *Cf. Hopkins v. State,* 193 Md. 489, 498, 69 A.2d 456 (1949), *appeal dismissed* 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950) ("It is generally held that the advice of counsel, even though followed in

ability to "view the facts calmly and dispassionately" and to "judge the facts in their legal bearings." *Id.* The requirement of full disclosure is imposed to prevent an advisee from using the defense as a shield when he or she has falsely omitted facts bearing upon the matter. *See Nance v. Gall,* 187 Md. 656, 50 A.2d 120 (1946) ("advice of counsel cannot protect where there has been a *'suppressio veri'* or *'suggestio falsi'* "). By the same token, advice of counsel cannot furnish a defense where an advisee has not relied in good faith upon the advice given. *See Hyde v. Greuch,* 62 Md. 577, 580 (1884) (defendant will not be exonerated from liability unless he acted upon advice of counsel, "believing such advice to be sound"). An examination of the record in the case *sub judice* reveals that Adams was under no illusions as to the nature of his conduct. The questions put to him in his bankruptcy and divorce proceedings were unmistakeably explicit. No legal expertise was required for Adams to comprehend the significance of his omission of information specifically called for in those proceedings. His awareness of the nature and potential consequences of his actions is illustrated by statements in his letters to Manown alluding to his criminal culpability, *see supra* n. 3 and accompanying text, and by his admission upon cross-examination that he "gave ... a lot of thought" to the possibility that his actions might subject him to future criminal penalties, and that he "took the chance" in spite of this possibility.[9] Thus, regardless of the advice he allegedly received from his former attorney, Adams was aware of the fraudu-

---

good faith, furnishes no excuse to a person for violating the law and cannot be relied upon as a defense in a criminal action.").

**9.** Adams' statements during his cross-examination were as follows:
Q: Did you think that by doing ... by failing to list it [the house in Frederick County] you were possibly subjecting yourself to future criminal penalties?
A: I gave it a lot of thought, yes.
Q: You were willing to take the chance?
A: I took the chance, not necessarily being willing. I took a chance. I'll admit to that.

lent nature of his conduct, and his attempt to shift the blame for that conduct must fail.

The circuit court was faced with indisputable evidence of fraudulent conduct directly relating to the funds at issue in this case. Adams, having transferred his property to Manown in an attempt to defraud his creditors, and possibly his former wife as well,[10] should not have been allowed to invoke the court's aid to retrieve that property—one ought not to take advantage of one's own wrong. *Accord Roman v. Mali*, 42 Md. at 513. We recognize, of course, that barring Adams' claim works to the advantage of Manown, who, having perhaps willingly participated in the commission of Adams' fraud, will now be allowed to pocket all the proceeds of that fraud. Our task, however, is not to inquire into the relative delinquency of these two parties, but rather to protect judicial integrity. To that end, our judgment is that the circuit court in this case should have applied the unclean hands doctrine to bar Adams' claim. We, therefore, hold that the circuit court abused its discretion in denying Manown's motion for summary judgment, and we reverse.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.

---

**10.** It is unclear whether Adams had actually made any transfers of funds to either the North Star account or to Manown individually when he filed his pleadings in his divorce action. Adams' pleadings in his divorce action, wherein he declared that he had not transferred to any person other than his wife any asset with a value in excess of $100, were filed 15 June 1987. His original complaint describes the transfers as beginning in June 1987. His amended complaint mentions 19 June 1987 as the date commencing his transfers of funds to the North Star account.