784 A.2d 583

**David A. GRUBER**

v.

**Kathie M. GRUBER.**

**No. 0341, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Oct. 31, 2001.

William M. Ferris (Krause & Ferris on the brief), Annapolis, for appellant.

Barbara E. Palmer (Steven L. Gonzales and Karp, Frosh, Lapidus, Wigodsky & Norwind, P.A. on the brief), Rockville, for appellee.

Argued Before ADKINS, PAUL E. ALPERT, (Retired, Specially Assigned), JOHN J. BISHOP, JR., (Retired, Specially Assigned), JJ.

ADKINS, Judge.

This case features a race to the courthouse and a novel question about the tactics one party used to win that race. Courts in two states have entered orders exercising jurisdiction over a custody dispute regarding a single child. Each court rejected a jurisdictional challenge by the non-resident parent. A court in Tennessee, where the child lived with her parents until her mother left the marital home in March 2000,

concluded that Tennessee is the child's home state and the most convenient forum to resolve custody issues. Then the Circuit Court for Anne Arundel County, where the child has lived since her mother left Tennessee, concluded that Maryland is the child's home state, as well as the place where the first custody complaint was filed and the most convenient forum.

In this interlocutory appeal, we must decide whether the circuit court erred in concluding that Maryland is the home state, and in deciding to exercise jurisdiction even though the Tennessee court already had determined that it would do so. In resolving the latter question, we address the father's complaint that the mother deliberately misled him in order to prevent him from seeking custody in Tennessee during the six-month period that the child's home state was undisputedly Tennessee, not Maryland.

## FACTS AND LEGAL PROCEEDINGS

David Gruber, appellant, and Kathie M. Gruber, appellee, lived together in Tennessee for approximately one year before they married in Memphis, on November 23, 1998. On May 5, 1999, their daughter Katarina was born, also in Memphis. The family lived together until March 18, 2000. On that day, Ms. Gruber left the marital home with ten-month-old Katarina. At that time, Ms. Gruber was not ready to talk to Mr. Gruber about certain issues. She testified that when Mr. Gruber asked when she would be ready, they agreed that it would be around the time of her birthday, which was approximately six months away.

Ms. Gruber returned to Maryland, where she had previously lived. She and Katarina arrived on March 21, 2000. She had family members in Maryland, including her ten-year-old son, who was then living with her first husband.

The Grubers continued to correspond about their relationship. Ms. Gruber preferred e-mail communication because she felt that Mr. Gruber could not monopolize it.

Mr. Gruber testified that from the time Ms. Gruber left Tennessee in March until late September, she continued to hold out the possibility of a reconciliation. He cited e-mail exchanges in June as evidence that Ms. Gruber asked him to be patient while she decided whether she wanted to stay in the marriage, and that she promised that she was not "stringing him along," all in an effort to dissuade him from seeking custody of Katarina during the six months after she arrived in Maryland.

In a June 17, 2000 e-mail, Mr. Gruber pressed Ms. Gruber for some indication of whether he should abandon his hope of reconciliation.

I don't see the problems as insurmountable, yet. It would be a long row to hoe, to be sure, but doable, at least at this point. But it would take two, and time is running out.... [You] appear to still be stuck where you were when you left 3½ months ago. I don't see any miraculous breakthroughs happening in the 2½ months left in your self-imposed time-out, if ever. We're past the half way point, and we've got Zippo good stuff going on, with no prospects or interest from you, indicated. **I think we could still have something good together, if you spoke up RIGHT NOW, and told me you wanted to TRY to make something together, and we started working towards it. Only you know whether that's what you want to do, or not. All I'm trying to say, is, NOW is the time to speak up, if you are ever going to do it. I've had enough heartache, and I'm ready to go on my life, with or without you in it.** I want you to know that I miss you, and would REALLY like you to be a part of my life, but am ready to have a happy life without you, if that's what you choose to do. I can't make that choice for you, that's something only you can do. **Right now you can choose to speak up, or choose to do nothing, and that will determine where things go.** (Emphasis added.)

On June 18, Mr. Gruber sent a follow up e-mail, specifically asking whether he had any reason to wait before filing "divorce papers."

I have to confess being a bit concerned that I haven't heard from you in a while. In an earlier email, you said you weren't ignoring me, but it kind of looks that way. Maybe you've been busy, or maybe it's something else. I would like to know why I haven't heard from you.

If you have issues about us, there is still time to discuss them, and work something out, at least for a little while longer. **If you've decided that you aren't interested in an "us", then I deserve to know that, too, so I can go ahead and file the divorce papers, and not prolong this any longer than necessary. Lastly, if you aren't sure, you need to let me know just where you are at, so we can figure out TOGETHER where to go next.** Your shields are WAY up, and you aren't letting me see anything.... I have more at stake in this deal, than anyone else in the whole world! I'm fighting for me, I'm fighting for you, and most of all, I'm fighting for Kat to have a family! (Emphasis added.)

In a June 19 reply, Ms. Gruber told him that she was not yet ready to answer his questions, and that he should not expect an answer any time before six months from when she left Tennessee.

You continue to ask the question I can't answer. **I have told you repeatedly I am not prepared to answer the question now, that I \*guessed\* I'd need the 6 months, and that it's looking like at least that much is the case.** But you were pressing me less than a month after I left. I am working intensely on me; finding a job, place to live, setting up counseling.... I am NOT where I was when I left, AND I can't answer your question with the sort of information I had hoped to have when asked it.

**If YOU can't wait that long, and you DO need to do what you need to for you. I will answer the question, prepared or not, at that 6 month mark, unless I KNOW something sooner.** Right now, I'm still reacting to you, so I know I haven't got what it takes to work on "us" if I wanted to. It wouldn't be a healthy move....

**I don't mean to string you along. I have said, and I'll say again, I do NOT wish to commit to filing until I can work through some of these issues.** I don't want to do something I regret. AND, I still feel everything I have said. That I can't change you and I can't live with your ways. And away from [my son]. I haven't waffled about this. I've been a broken record. It's NOT that I've been stuck; I guess it's that I'm not yet strong enough to be able to even Choose a yes answer. I'm still reacting into the "no" zone. **I have no idea how long it will take; 6 months was a guess**....

**Anyway, if you need to file, you need to. I understand about the limbo. But, please, stand by your own previous words where you said it's up to me to say something, to initiate. You have never been patient**.... **I feel pressured and everything takes a step backward**....

I'll try to communicate better, but, ... I have been doing the best I can! (Emphasis added.)

What Ms. Gruber did not say in this correspondence was that she already had filed a complaint seeking sole custody of Katarina. Twelve days before her June 19 e-mail, on June 7, 2000, she filed a complaint against Mr. Gruber,[1] asking the Circuit Court for Anne Arundel County to award her "sole legal and primary physical custody" on the grounds that she had been Katarina's primary caretaker and was "a fit and proper person to have custody of the parties' child." She alleged that "it is in the best interest of the child ... that this Court assume jurisdiction," but did not state that Katarina had been living in Maryland for only eleven weeks. Instead, she asserted a "substantial contacts" basis for jurisdiction—that "[t]here is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

---

1. Ms. Gruber's Maryland attorney previously represented her in her interstate efforts during 1999 to obtain a judicial modification of the custody order relating to her son.

Ms. Gruber maintained her silence about her custody complaint in her subsequent correspondence with Mr. Gruber. She did not mention it in her e-mail of June 30, in which she discussed arrangements for Mr. Gruber to come to Maryland for a visit with Katarina, and again emphasized that his inquiries about her intentions would drive her away.

> Let me say it AGAIN, maybe in different words. I do NOT want to connect at this time. I am AFRAID to because I am STILL reacting to you.... You ARE pushing, have been pushing, keep pushing, won't stop pushing, causing me to want to increase the distance and CREATING stress that has otherwise eased incredibly. You continue to ask the "us" question when I tell you the answer is "no," because you're asking now. I HAVE NO FUTURE GUARANTEES, but **I guarantee that your asking now will get a no. If that means that the options aren't open, in your mind, then I can do nothing about it.**

Nor did she mention it during Mr. Gruber's ensuing visit with Katarina.

Ms. Gruber waited until September 26, five days after the six-month anniversary of Katarina's arrival in Maryland, to advise Mr. Gruber that she did not intend to reconcile. In a single sentence e-mail, Ms. Gruber informed Mr. Gruber that "[a]s the 6 months are up, and you deserve the answer, I still realize that I can't be in a relationship, therefore I've seen a lawyer to draw up papers."

On the previous day, Ms. Gruber had signed an amended complaint seeking both divorce and custody, and adding an allegation that Katarina had resided in Maryland "continuously for at least six months." The amended complaint was filed on October 11, 2000, and served on Mr. Gruber on October 14, 2000, while he was in Maryland making an unsuccessful attempt to visit Katarina. He testified that it was only after he was served that he discovered Ms. Gruber had filed for custody in Maryland, just seven weeks after she and Katarina left Tennessee.

Immediately upon his return to Tennessee, on October 18, 2000, Mr. Gruber filed a complaint for divorce and custody, in which he alleged that the separation occurred on September 29, 2000. While Mr. Gruber's petition for pendente lite custody was pending in the Tennessee court, the parties discussed a consensual resolution of custody pending resolution of the continuing jurisdictional dispute. On November 2, they appeared in the Anne Arundel County Circuit Court to put on the record a pendente lite agreement regarding custody and visitation. That agreement explicitly preserved the jurisdictional dispute.

On November 9, 2000, the Circuit Court of Shelby County, Tennessee exercised jurisdiction to adjudicate the question of Katarina's custody. It entered an ex parte order giving Mr. Gruber temporary custody and ordering Ms. Gruber to return Katarina to Tennessee.

The Tennessee order, however, did not resolve the dispute in Maryland. In an order dated November 16, 2000, Judge Cawood recounted the parties' judicial skirmishes in Maryland during the preceding two weeks.[2] He also noted that Mr. Gruber had indicated to authorities that he intended to come to Maryland and take the child, pursuant to the Tennessee court's order.[3] On November 20, the court entered a Consent Order that the Grubers would share joint legal custody, and that Ms. Gruber would have temporary physical custody,

---

**2.** On November 6, before any consent order was presented to the Anne Arundel court, Mr. Gruber filed a Motion to Dismiss or Change Venue. On November 8, Mr. Gruber filed a Motion to Shorten Time. On November 16, the circuit court entered an order summarizing the November 2 agreement and Mr. Gruber's subsequent motions. The November 16 order mischaracterized the parties' temporary custody and visitation agreement as "a plan whereby Ms. Gruber would have the child permanently with Mr. Gruber seeing the child at certain times[,] ... [with] [t]he question of review in this Court ... to remain open." After a review of the tapes from the November 2 hearing, the court signed a November 20 "Consent Order" setting forth the agreed upon custody and visitation schedule through February 2001.

**3.** Mr. Gruber repeatedly has denied that he contacted any Maryland authorities with this message.

subject to a specific visitation schedule through February 2001. By separate order dated November 21, Judge Cawood denied Mr. Gruber's motion for an immediate hearing on jurisdiction.

The next week, on November 29, the Tennessee court held a hearing regarding the jurisdictional and pendente lite issues raised by Mr. Gruber's petition. By order dated December 1, 2000, the Tennessee court held that it had "subject matter and in personam jurisdiction to adjudicate this cause as Tennessee is the home state of the minor child. . . ." It also ordered the parties to submit to "a custodial and psychological evaluation" with a court-appointed psychologist, scheduled a final hearing on custody for December 18, 2000, and extended its ex parte orders until that time. Once again, it ordered Ms. Gruber "to forthwith return the minor child to her home in Shelby County, Tennessee where said child shall remain until further orders of the court. . . ."

Katarina, however, remained in Maryland with her mother, who continued her efforts to persuade Judge Cawood to assert jurisdiction. On January 5, 2001, the Anne Arundel Circuit Court held an evidentiary hearing regarding its jurisdiction over the custody dispute. In a January 16 written order, the court rejected Mr. Gruber's argument that the six-month period necessary to establish home state jurisdiction began only after Ms. Gruber notified him of her intent not to reconcile, because a contrary rule would require "a mini-merits hearing in most jurisdictional cases." It concluded that Maryland became Katarina's home state six months after she arrived with her mother. The remaining issue was whether Maryland or Tennessee was the most convenient forum under FL § 9–207. The court reserved its decision on that question pending further discussion with the Tennessee judge. The court expressed its hope that the two courts could agree on "what state is appropriate."

In March 2001, counsel for both Mr. Gruber and Ms. Gruber requested that the circuit court make a decision about whether it would decline to exercise jurisdiction on forum non conve-

niens grounds. Mr. Gruber's counsel also advised the court that the Tennessee court recently had entered a Final Decree of Divorce, dated nunc pro tunc to January 31, 2001, after finding again that Tennessee was the most convenient forum for litigating the custody dispute.

In response, the Anne Arundel court issued a March 20 written opinion stating that it "will try the case." After a review hearing at which counsel for both parties appeared, the court entered a March 30, 2001 order. "Based on the Opinion of March 20 ... this Court assume[s] jurisdiction of this matter." Mr. Gruber then filed this appeal.

## DISCUSSION

Throughout the Maryland proceedings, Mr. Gruber consistently argued that Ms. Gruber "acquired the residency time in Maryland ... through fraud and deception towards me, and so should not be allowed to reap benefits from those reprehensible actions. . . ." He reiterates that argument here, complaining that the trial court erred in failing to consider Ms. Gruber's deceptive conduct in determining that the six months Katarina lived in Maryland were sufficient to establish Maryland as the child's home state. In addition, he argues that the trial court erred in failing to treat the child's presence in Maryland from March through at least June 7 (when Ms. Gruber filed for custody) as a "temporary absence from Tennessee." He correctly characterizes both questions as "matters of first impression in this State."

Ms. Gruber counters that the circuit court did not abuse its discretion in refusing to consider parental uncertainties regarding reconciliation as the yardstick by which the length of a child's home state residency should be measured. She also argues that, in the absence of any proof of a wrongful taking, the trial court did not abuse its discretion in deciding to exercise jurisdiction over the custody dispute.

For the reasons that follow, we agree that in deciding to exercise home state jurisdiction, the trial court erred in failing to consider the substantial evidence that Ms. Gruber obtained

the six-month residency for Katarina by misrepresentations that Mr. Gruber relied upon to his detriment. We do not agree, however, that the trial court was required to treat the time between Katarina's departure from Tennessee and Mr. Gruber's realization that the marriage was over as "a temporary absence" from Tennessee.

## I.

### Motion To Dismiss Interlocutory Appeal

Preliminarily, we must address Ms. Gruber's motion to dismiss this interlocutory appeal. She argues that the appeal is premature because the circuit court's

> March 30, 2001 order does not deprive [Mr. Gruber] of the custody or care of his child, nor change the terms of such an order. Rather, the Order assumes jurisdiction in order to reach an initial custody decision. [Mr. Gruber's] accepting the benefit of *pendente lite* visitation and evaluation orders of the Maryland court should result in dismissal of this appeal.

We reject the notion that Mr. Gruber's November 2000 appearance and consent to a temporary custody and visitation order by the circuit court estopped him from challenging the court's subsequent decision to exercise jurisdiction. The record shows that Mr. Gruber preserved his jurisdictional objections. After listening to the tapes of that hearing, the circuit court explicitly ordered "that this Consent Order is without prejudice to any argument pertaining to jurisdiction." So it was, both in the circuit court and this Court.

We conclude that Mr. Gruber's appeal is authorized under Md.Code (1974, 1998 Repl.Vol.), section 12–303 of the Courts and Judicial Proceedings Article, which provides that "[a] party may appeal from ... [a]n [interlocutory] order .... [d]epriving a parent ... of the care and custody of his child, or changing the terms of such an order." In the unusual circumstances of this case, a Maryland court decided to exercise jurisdiction over a child custody dispute that was already

the subject of another court's pendente lite order giving one parent certain custodial and visitation rights. The Maryland court did so in order to address the very same pendente lite and permanent custody issues. We conclude that the Maryland court's decision to exercise home state jurisdiction was an appealable interlocutory order that changed the terms of a child custody and visitation order, because the effect of that decision was to render the Tennessee court's pendente lite order unenforceable in the state where Mr. Gruber sought to enforce it. The March 30 order of the circuit court prevented Mr. Gruber from enforcing his rights under the pendente lite order of the Tennessee court, thereby depriving Mr. Gruber of the pendente lite care and custody of Katarina that he enjoyed under the Tennessee order. We hold that the circuit court's order falls within the purview of section 12–303(3)(x), and is an appealable interlocutory order.

## II.

### Maryland Court's Exercise Of Home State Jurisdiction

■ One purpose of the Uniform Child Custody Jurisdiction Act ("UCCJA")[4] is to prevent parents battling over the custody of their children from engaging in the type of forum shopping that prolongs custody disputes and breeds parental resistance to custody orders. "It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will remove the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find . . . a more sympathetic ear for their plea for custody." *Olson v. Olson,* 64 Md.App. 154, 160, 494 A.2d 737 (1985) (quoting UCCJA, 9 U.L.A. Commissioners' Prefatory Note at 111–12 (1968)).

To avoid forum shopping and to promote both finality and acceptance of child custody orders, "all 50 states and the

---

4. We shall cite to the specific sections and comments to the UCCJA in the following format: "UCCJA § _____ comment."

District of Columbia have adopted the Uniform Child Custody Jurisdiction Act." *Gestl v. Frederick*, 133 Md.App. 216, 224, 754 A.2d 1087 (2000). In Maryland, the UCCJA is codified at Md.Code (1984, 1999 Repl.Vol.) § 9–201 *et seq.* of the Family Law Article ("FL") (the "Act").

To avoid judicial turf wars, the Act establishes ground rules for determining which court should exercise jurisdiction over a child custody dispute. *See Gestl*, 133 Md.App. at 225, 754 A.2d 1087. Although there are four alternative bases for exercising jurisdiction,[5] the state with "home state jurisdiction" generally has priority. *See id.* at 226, 754 A.2d 1087. The Act provides that a court

> has jurisdiction to make a child custody determination by initial decree ... if ... [that state] is the home state of the child at the time of commencement of the proceeding ..., or ... had been the child's home state within 6 months before commencement of the proceeding and the child is absent from [that] state because of the child's removal ... by ... a [parent] claiming custody ..., and [that] parent ... continues to live in that state.

FL § 9–204(a)(1). A child's home state is

> the state in which the child, immediately preceding the time involved, lived with the child's parents [or] a parent .... for at least 6 consecutive months.... Periods of temporary absence of any of the named persons are counted as part of the 6 month ... period.

FL § 9–201(f).

Thus, even after the child leaves a state, that state remains the home state for another six months. The purpose of this "extended home state jurisdiction" is "to protect a

---

5. Under the UCCJA, a state also may exercise jurisdiction (1) if it has significant contacts with the child; (2) if the child has been abandoned in the jurisdiction, or if there is an emergency threatening the child's welfare while residing in the jurisdiction; or (3) if "no other state would have jurisdiction," or if "another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child[.]" FL § 9–204(a).

parent who has been left by his spouse taking the child along. The provision makes clear that the stay-at-home parent, if he acts promptly, may start proceedings in his own state if he desires, without the necessity of attempting to base jurisdiction on [the child's significant contacts with that state]." UCCJA § 3 comment.

■ When it becomes apparent that a proceeding concerning the custody of a child is pending in a court in another jurisdiction,[6] a Maryland court must determine whether to exercise jurisdiction. *See Paltrow v. Paltrow,* 37 Md.App. 191, 196, 376 A.2d 1134 (1977), *aff'd,* 283 Md. 291, 388 A.2d 547 (1978). Except in emergencies, a court "shall not exercise its jurisdiction under this subtitle if, at the time of filing the petition, a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this subtitle, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons."[7] FL § 9–206(a). Once the court is aware of a pending custody proceeding in another state, "it shall direct an inquiry to the state court administrator or other appropriate official of the other state." FL § 9–206(b). Depending upon when the

--------

**6.** " 'Pending' means that a case has been filed and is not concluded." *Gestl v. Frederick,* 133 Md.App. 216, 227, 754 A.2d 1087 (2000) (citation omitted).

**7.** Under the Parental Kidnaping Prevention Act ("PKPA"), 28 U.S.C. § 1738A (2001), which is the federal analog to the UCCJA, the home state has priority to make custody decisions. The PKPA essentially "confers exclusive and continuing jurisdiction on the home state," by directing courts not to "exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination." 1 *Child Custody & Visitation Law and Practice,* § 3.01[3][c], at 3–15 (Matthew Bender 2001); 28 USC § 1738A (g); *see also Harris v. Simmons,* 110 Md.App. 95, 107–08, 676 A.2d 944, *cert. denied,* 343 Md. 680, 684 A.2d 454 (1996) (PKPA forbids use of substantial contacts jurisdiction in child custody litigation, unless there is no home state or the home state declines to exercise jurisdiction).

respective custody petitions were filed, and whether one of the states already has assumed jurisdiction, the two courts may be able to agree upon which state is the more appropriate forum.

> If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction, it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged.... If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction, it shall likewise inform the other court to the end that the issues may be litigated in a more appropriate forum.

FL § 9–206(c). A temporary restraining order regarding pendente lite custody and visitation is a "proceeding" under the Act. *See Cronin v. Camilleri,* 101 Md.App. 699, 706, 648 A.2d 694 (1994), *cert. denied,* 339 Md. 166, 661 A.2d 700 (1995).

■ One factor that each of the forum courts must consider is whether jurisdiction should be declined by reason of one party's conduct. *See* UCCJA § 8 & comment (jurisdiction declined by reason of conduct). "If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court may decline to exercise jurisdiction if this is just and proper under the circumstances." FL § 9–208(a).

In this case, the circuit court concluded that it had home state jurisdiction, and decided to exercise that jurisdiction even though the Tennessee court already had asserted home state jurisdiction and issued custody orders. In January 2001, the court concluded that Maryland became Katarina's home state six months after she arrived with her mother. In March, the court decided to exercise home state jurisdiction for the following reasons.

> The child here is very young. The marriage existed in Tennessee, but by the time of filing in this state[,] the time in each state was not substantially different, especially for

an infant. The questions that will be addressed are really about the parents.

Maryland was the state of first filing. That is far from dispositive. To us ... there are more substantial issues, but it is mentioned in Family Law 9–206(a). We had a hearing and found that, after testimony from both parties, she did not take the child wrongfully from the state. Both *Harris v. Simmons*, 110 Md.App. 95, 676 A.2d 944 ... and primarily PKPA, 28 USC § 1738A, emphasize the importance of home state determination. We believe that is dispositive here and will try the case.

Mr. Gruber complains that the trial court erred (1) in concluding that it had home state jurisdiction, because a portion of Katarina's first six months in Maryland was merely a "temporary absence" from Tennessee; and (2) in "reject[ing] the notion that [Ms. Gruber's] deceptive tactics had any bearing on whether she had successfully acquired Maryland jurisdiction...." We shall address these questions separately.

### A.

### "Temporary Absence" Caused By Marital Separation

In its January findings, the Anne Arundel court observed that the Act "deals primarily with physical presence," and that "jurisdiction will attach unless there is some factor other than time which is controlling." It concluded that Maryland had home state jurisdiction because Katarina's residency in Maryland since March satisfied the six month test. In doing so, it explicitly rejected Mr. Gruber's argument that Katarina's Maryland residency "was only temporary because [Mr. Gruber] held out the hopes [Ms. Gruber] might come home" along with Katarina. That reasoning, the court explained, would require courts to "start this six month clock when the marriage appeared irretrievably broken." Determining that date would require an inappropriate "mini-merits hearing in most jurisdictional cases."

Mr. Gruber argues that the circuit court erred by predicating its finding that Maryland was Katarina's home state on the

six months she spent here between March and September 2000. He contends that her "presence in Maryland was a temporary absence from Tennessee" until sometime in June, which is the earliest date that he might have realized Ms. Gruber intended to stay in Maryland with Katarina.[8] In Mr. Gruber's view, "Tennessee was still the child's home state when" he filed his complaint for custody in Tennessee on October 18, 2000, less than six months later.

Ms. Gruber counters that the circuit court properly made its home state determination without excluding any time during which Mr. Gruber failed to realize the "non-temporary nature" of Ms. Gruber's move to Maryland. Moreover, she points out, even if the court had considered "the parties' intent and any agreement between them," that "would not affect the result here" because "there was no agreement between the parties that [Ms. Gruber's] move with Katarina would be temporary."

The Act does not define "temporary absence." Nor is there any Maryland case law construing that term. Mr. Gruber relies on extra-jurisdictional cases holding that a court may determine whether a child's absence from her home state was temporary by examining the parents' mutual understanding about both the reasons for the child's presence in another state, and the anticipated duration of that residency. He cites the majority opinion of a divided Illinois appellate court in *Richardson v. Richardson*, 255 Ill.App.3d 1099, 193 Ill.Dec. 1, 625 N.E.2d 1122 (1993), which held that the "temporary absence" clause covered eleven months that a child spent in Illinois in order to attend school, with the permission of both parents.

The *Richardson* majority rejected a strict physical presence analysis. *Id.* 193 Ill.Dec. 1, 625 N.E.2d at 1124. "In deciding whether a child 'lived' in a particular state for purposes of determining whether that state qualifies as the child's home state, a court must not only examine whether the child was

---

**8.** The circuit court cited a June 7 e-mail from Mr. Gruber to Ms. Gruber's former husband as evidence that by that time, Mr. Gruber "knew it was all but over."

physically in that state, but also, under what circumstances the child came to and remained in the state." *Id.* When, as in that case, the parents agreed that the child's presence in the new state was for a specific period and reason—for the school year—the child's absence from her home state could not be counted toward the six months necessary to establish home state jurisdiction. Mr. Gruber points out that other courts have adopted *Richardson's* "totality of the circumstances" test. *See, e.g., In re Marriage of Howard,* 291 Ill.App.3d 675, 225 Ill.Dec. 703, 684 N.E.2d 178, 181 (1997); *In re Frost,* 289 Ill.App.3d 95, 224 Ill.Dec. 409, 681 N.E.2d 1030, 1035–36 (1997); *In re S. M.,* 938 S.W.2d 910, 918 (Mo.App.1997).

Ms. Gruber counters that the better rule is the one announced in the *Richardson* concurring opinion, which rejected the reasoning of the majority, concluding instead that Illinois had become the child's home state six months after she arrived for the school year. *See Richardson,* 193 Ill.Dec. 1, 625 N.E.2d at 1127. It criticized the majority's "open-ended definition" of "temporary absence," because it would render the six-month statutory benchmark "virtually meaningless." *Id.* Rather than straining to conclude that Illinois was not a home state, the preferable analytical framework would be to conclude that Illinois had become the child's second home state, and then proceed to determine whether Illinois should decline to exercise its home state jurisdiction under principles of *forum non conveniens. Id.* 193 Ill.Dec. 1, 625 N.E.2d at 1128. Under that analysis, "Illinois [was] the least convenient forum." *Id.* 193 Ill.Dec. 1, 625 N.E.2d at 1129.

Mr. Gruber argues that instead of following the majority in *Richardson,* the circuit court approved and applied the reasoning of the concurring opinion, which was followed in another Illinois case that the circuit court also cited as persuasive.[9]

---

**9.** In *In re Marriage of Schoeffel,* 268 Ill.App.3d 839, 206 Ill.Dec. 59, 644 N.E.2d 827 (1994), a different Illinois appellate court rejected a father's argument that the nine months during which his children were in New York as a result of their mother leaving the marital home in Illinois were merely a "temporary absence." *Id.* 206 Ill.Dec. 59, 644 N.E.2d at

Whether a court should decide home state jurisdiction by inquiring into the parents' intentions regarding the child's move raises an issue that Maryland's appellate courts have not yet addressed. This case, however, does not require us to answer that question, because even under a "parental intent" standard, Mr. Gruber has not shown that the trial court erred in finding that Katarina's presence in Maryland from March to June was not merely a "temporary absence" from Tennessee.

■ We may not reverse a court's determination that it has home state jurisdiction under the Act unless the findings of fact upon which it was based were clearly erroneous. *See Gestl v. Frederick*, 133 Md.App. 216, 231, 754 A.2d 1087 (2000). Here, the court made a factual finding that when Ms. Gruber and Katarina left Tennessee in March, "there was an intent to separate, and the child clearly went to Maryland."

■ We find substantial evidence in the record to support that finding. The record shows that Ms. Gruber departed Tennessee with Katarina in order to take a "time-out" from the marriage, during which she considered whether to end it or to reconcile. Both parents acknowledged that Ms. Gruber's departure from Tennessee might not be temporary. Given that Katarina's departure was directly related to Ms. Gruber's

---

830. The court explained that inquiries into parental intent surrounding a move from one state to another

unnecessarily complicate[ ] what was intended to be a simple "home State" test .... [and mistakenly] incorporate all the nuances of domicile into the Act's definition of "home State." It is also a mistake to allow parties to make agreements which control the operation of the Act.

*Id.* 206 Ill.Dec. 59, 644 N.E.2d at 830.

Thus, "[w]hether a State is the person's domicile is primarily a question of that person's intent; whether a State is a child's 'home State' is primarily a question of time." *Id.* 206 Ill.Dec. 59, 644 N.E.2d at 829. Accordingly, the court concluded that "[t]he intent of the [parents] is not controlling for purposes of the Act." *Id.* 206 Ill.Dec. 59, 644 N.E.2d at 829. Ultimately, the *Schoeffel* court "reject[ed] *Richardson*" and the argument that the time the children spent in another state can be attributed to their former home state on the basis of some alleged intent on the part of the parents. *Id.* 206 Ill.Dec. 59, 644 N.E.2d at 830.

departure, the nature of Katarina's move to Maryland was similarly uncertain. There was no evidence that both parents agreed that Katarina's move to Maryland was for some inherently "temporary" purpose. Nor was there any evidence that both parents agreed that the duration of Katarina's residency would be for a particular length of time.

Even when viewed under the legal standard most favorable to Mr. Gruber, and in the factual light most favorable to Mr. Gruber, we cannot say that Katarina's presence in Maryland was simply a "temporary absence" from Tennessee. The circuit court's finding that Katarina began living in Maryland upon her arrival was not clearly erroneous. That finding led the court to conclude that Maryland had become Katarina's home state during the time that Ms. Gruber's initial custody petition was pending, but not disclosed to Mr. Gruber. Based on that conclusion, the court decided that, as a home state forum where the first custody petition was filed, it would exercise jurisdiction to decide the custody dispute. We examine that decision to exercise jurisdiction next.

## B.

### Deception Inducing Forbearance During The Six–Month Residency Period

As we see it, this jurisdictional conflict between Maryland and Tennessee comes down to one troubling issue: whether the circuit court should have declined to exercise jurisdiction because Ms. Gruber deceived Mr. Gruber into forbearing from legal action during the six month period that Katarina's only home state was Tennessee. The record contains substantial evidence that might support a finding that Ms. Gruber engaged in deliberate concealment and deception in order to obtain home state jurisdiction in Maryland. There was evidence that:

- Ms. Gruber was aware of the six-month residency requirement for establishing home state jurisdiction. She obtained legal advice about seeking court-ordered custody of

Katarina, including an explanation of the six-month benchmark for home state jurisdiction.

- At the time Ms. Gruber filed her initial custody complaint, on June 7, 2000, Katarina's home state was still Tennessee. *See* § 9–201(f).

- During the next three and a half months, Ms. Gruber continued to communicate with Mr. Gruber, via e-mail and when he traveled to Maryland to visit Katarina, but never told him that she had filed a custody complaint against him.

- During this period, Mr. Gruber expressed a desire to proceed with filing legal papers if Ms. Gruber decided she did not want to reconcile. In response, Ms. Gruber asked Mr. Gruber to "be patient" for a six-month period while she decided whether to reconcile, and warned him that she would not reconcile if he filed before she made that decision.

- Ms. Gruber promised Mr. Gruber that she was not stringing him along and that she would let him know as soon as she knew what she wanted to do about their marriage.

- Ms. Gruber finally told Mr. Gruber that she did not wish to reconcile on September 26, five days after Katarina reached the six-month residency benchmark, and one day after she signed an amended complaint asserting home state jurisdiction based on that residency.

Citing this evidence, Mr. Gruber complained to the circuit court that throughout the six-month period between Ms. Gruber's arrival in Maryland (March 21) and her "final answer" about reconciliation (September 26), Ms. Gruber "actively discouraged [Mr. Gruber] from filing suit in Tennessee, . . . claiming that she needed as much as six months away from him in order to decide whether she wanted to reconcile." He testified that Ms. Gruber persuaded him to forbear from filing for custody in Tennessee during the six months after she left Tennessee, by warning him that if he "pushed" her to give a final answer during that period, or filed legal papers himself, the reconciliation he hoped for would not occur. These repre-

sentations, he argued, were misleading both in what they said (*e.g.*, "I do NOT wish to commit to filing until I can work through some of these issues") and what they did not say (*i.e.*, "But I already have filed for custody, in Maryland").

In its January 16 written "findings" after the evidentiary hearing, the circuit court recognized that Ms. Gruber "held out some hopes that [she and Mr. Gruber] might reunite, quite possibly to avoid a confrontation, or to establish jurisdiction." Nevertheless, it "saw no reason to go beyond the six month test" in deciding that Maryland had become Katarina's home state. Later, in its March 30 decision, the court decided to exercise home state jurisdiction without addressing the possibility that Ms. Gruber's conduct might be a reason for declining to do so.

On appeal, Mr. Gruber argues that the court erred by treating the home state finding as dispositive, instead of considering whether jurisdiction should be declined by reason of Ms. Gruber's reprehensible conduct. This argument raises two legal issues: (1) whether the type of fraudulent conduct that Ms. Gruber allegedly committed constitutes "reprehensible conduct" under section 9–208(a), and (2) whether the circuit court erred by failing to consider whether it should decline to exercise jurisdiction due to Ms. Gruber's conduct.

### 1.

### The Use Of Deception To Obtain Home State Jurisdiction Is "Reprehensible Conduct"

In *Gestl v. Frederick*, 133 Md.App. 216, 754 A.2d 1087 (2000), we recently affirmed that "[g]enerally, a 'home state' should be the jurisdiction to hear and decide custody disputes." *Id.* at 226, 754 A.2d 1087. Nevertheless, we also recognized that Maryland courts may be "precluded from exercising jurisdiction" for other reasons.[10] *Id.* at 227, 754

---

**10.** In *Gestl*, we reversed the circuit court's decision not to exercise home state jurisdiction, under forum non conveniens principles. *See Gestl*, 133 Md.App. at 245, 754 A.2d 1087; FL § 9–207.

A.2d 1087. In particular, we cautioned that when a custody action is pending in another state, a Maryland court must determine whether it should exercise its home state jurisdiction. *Id.*

■ In doing so, the court must consider the resident parent's conduct. Section 9–208(a) authorizes the court to decline jurisdiction when that jurisdiction results from the petitioning parent's misconduct: "If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in *similar reprehensible conduct,* the court may decline to exercise jurisdiction if this is just and proper under the circumstances." FL § 9–208(a) (emphasis added). For the reasons that follow, we conclude that fraudulent or intentionally misleading conduct may be "reprehensible conduct" warranting a refusal to exercise jurisdiction.

We have not found a reported Maryland opinion involving reprehensible conduct other than the wrongful taking or concealment of a child. *See, e.g., Cronin v. Camilleri,* 101 Md.App. 699, 709–10, 648 A.2d 694 (1994), *cert. denied,* 339 Md. 166, 661 A.2d 700 (1995) (father's wrongful removal of children from Maryland to avoid court ordered appearance was reprehensible); *Malik v. Malik,* 99 Md.App. 521, 532–33, 638 A.2d 1184 (1994) (mother's wrongful taking and retention of child was reprehensible); *cf. Etter v. Etter,* 43 Md.App. 395, 405, 405 A.2d 760 (1979) (mother's justified taking of child was not reprehensible). We note that courts in other states, including Tennessee, have found conduct other than "child stealing" sufficiently reprehensible to decline jurisdiction. *See, e.g., Stokes v. Stokes,* 751 P.2d 1363, 1365–66 (Alaska 1988) (mother's dismissal of petition in another state and removal of child to Alaska without notice to the father justified dismissal of her petition); *Marcus v. Marcus,* 993 S.W.2d 596, 602–03 (Tenn.1999) (mother's violations of child custody orders in North Carolina warranted dismissal of her Tennessee petition for custody); *Brown v. Brown,* 847 S.W.2d 496, 506 (Tenn.1993) (father's violation of visitation order precludes any petition for modification of custody).

But none of these cases involved the alleged misconduct at issue in this case—the use of deception to obtain home state jurisdiction. Thus, we must determine whether section 9–208(a) required the court to consider whether Ms. Gruber engaged in deceptive conduct that should not be rewarded by the exercise of Maryland jurisdiction.

■■■ As we do in construing any statute, we look to the language and purpose of section 9–208(a). The Act does not explicitly define "reprehensible conduct," but does implicitly recognize that conduct other than the wrongful taking or retention of a child may warrant a refusal to exercise jurisdiction. The ordinary meaning of "reprehensible" is "[d]eserving rebuke or censure; blameworthy." *American Heritage Dictionary of the English Language,* 4th ed. (2000). Synonyms include "censurable, culpable, guilty." *See Roget's II: The New Thesaurus,* 3d ed. (1995).

The commissioners who drafted this section of the UCCJA described reprehensible conduct in terms of the established doctrine that equity will not assist a complainant who has gained an advantage by fraudulent means. *See Townsend v. Morgan,* 192 Md. 168, 174–75, 63 A.2d 743 (1949). In the official comment, they explained that

> *[s]ubsection (a) extends the clean hands principle to cases in which a custody decree has not yet been rendered in any state.* ... "Wrongfully" taking under this subsection does not mean that a "right" has been violated... but that *one party's conduct is so objectionable that a court in the exercise of its inherent equity powers cannot in good conscience permit that party access to its jurisdiction.*

*See UCCJA* § 8 comment (emphasis added). In a similar vein, this Court has characterized the analogous provision in section 9–208(b), relating to petitions for modification, as being directed at "case[s] in which [a parent] seeks the assistance of the Maryland courts to legitimize improper conduct on his [or her] part." *Olson,* 64 Md.App. at 164, 494 A.2d 737.

Fraud traditionally has been the type of "blame-worthy," "censurable," and "objectionable" conduct that courts will not aid. Under established equitable principles, a party may be estopped from obtaining judicial relief by fraudulent conduct in the transaction that is placed before the court.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*Impala Platinum, Ltd. v. Impala Sales (USA), Inc.,* 283 Md. 296, 322, 389 A.2d 887 (1978) (citations omitted). Through the doctrine of unclean hands, courts avoid endorsing or reward-ing fraudulent conduct. *See, e.g., Manown v. Adams,* 89 Md.App. 503, 511, 598 A.2d 821 (1991), *vacated on other grounds,* 328 Md. 463, 615 A.2d 611 (1992) ("the idea being that judicial integrity is endangered when judicial powers are interposed to aid persons whose very presence before a court is the result of some fraud or inequity").

Based on both the language of the statute and the drafters' intent, we conclude that fraudulent conduct designed to obtain child custody jurisdiction constitutes "reprehensible conduct" within the meaning of section 9–208(a). Section 9–208(a) is targeted at "those situations where jurisdiction exists because of the unjustified conduct of the person seeking to invoke it," *Child Custody & Visitation, supra,* App. 3C–43, whether the misconduct is the wrongful taking of a child or the wrongful deception of the other parent. This construction is also consistent with the Act's direction that it "shall be construed to promote the general purposes" stated in the Act. *See* FL § 9–202(b).

One critical goal of the UCCJA is to avoid the ills resulting from forum shopping, including the type of jurisdictional

deadlock we see in this case. *See* FL § 9–202(a)(1). When a mother misrepresents and conceals material information in order to persuade a father to refrain from initiating custody proceedings during the six-month period when he easily could have obtained extended home state jurisdiction, her conduct is precisely the type of bad faith forum shopping that the UCCJA seeks to deter. Treating deception that creates home state jurisdiction as "reprehensible conduct" ensures that the deceptive parent will not gain an advantage from such objectionable conduct. By declining to reward fraudulent tactics used to obtain home state jurisdiction, courts discourage forum shopping and its concomitant ills. *See Malik*, 99 Md.App. at 531, 638 A.2d 1184 (exercising jurisdiction created by parent's wrongful taking of child "would only encourage such behavior").

They also protect the stay-at-home parent's opportunity to obtain extended home state jurisdiction by filing for custody within six months of the child's departure from the family home. "Extended home state" jurisdiction is an important "equalizer" for the stay-at-home parent, because it "mitigate[s] the advantage enjoyed by the party who has physical possession of the child." *Malik*, 99 Md.App. at 529, 638 A.2d 1184; *see* UCCJA § 3 comment. Allowing a departed parent to prevent the stay-at-home parent from obtaining extended home state jurisdiction through fraudulent conduct would defeat this feature of the UCCJA, and consequently invite the "win the race to the courthouse at any cost" tactics that the UCCJA seeks to prevent. *See* 1 *Child Custody & Jurisdiction, supra*, at App. 3C–43 ("If the conduct that creates the jurisdiction is unjustified, courts must decline to exercise jurisdiction that is inappropriately invoked by one of the parties").

We hold that deception directly resulting in the establishment of home state jurisdiction is reprehensible conduct that may be "so objectionable that a court in the exercise of its inherent equity powers cannot in good conscience permit that party access to its jurisdiction." UCCJA § 8 comment; *see*

FL § 9–208(a). Now we must apply that holding to the case before us.

## 2.

### The Court Erred In Failing To Consider Whether To Decline Jurisdiction Based On Ms. Gruber's Conduct

██ In reviewing the circuit court's decision to exercise home state jurisdiction, we must determine whether the court correctly followed the applicable law, and whether it abused its discretion in applying it. *See Gestl,* 133 Md.App. at 229, 754 A.2d 1087. Here, the circuit court explained that it had decided to exercise jurisdiction because Maryland became Katarina's home state. In its March order, the court explicitly stated that there was no factual basis for declining jurisdiction on the basis of a wrongful taking. It concluded that in the absence of any evidence that Ms. Gruber wrongfully took the child from Tennessee, it would treat Maryland's status as the home state where the first custody petition was filed as "dispositive." [11]

What the court failed to do in its March order, however, was to address the alternative possibility that it had raised in its January findings—that Ms. Gruber knowingly deceived Mr. Gruber in a successful effort "to obtain jurisdiction." Although the circuit court made a factual finding that Ms. Gruber did not obtain jurisdiction in Maryland by wrongfully taking Katarina from Tennessee, it did not make any finding about whether she obtained jurisdiction by intentionally deceiving Mr. Gruber into forbearing from legal action during the six months that Tennessee was still Katarina's home state.

██ We agree with Mr. Gruber that the circuit court erred in failing to consider whether Ms. Gruber's representations and nondisclosures constituted "reprehensible conduct"

---

11. In doing so, the circuit court properly recognized that under the PKPA, courts must give priority to the state court exercising home state jurisdiction to enter an initial custody decree.

that merited a decision not to exercise jurisdiction. *See, e.g., State ex rel. Rashid v. Drumm,* 824 S.W.2d 497, 502 (Mo.App. 1992) (trial court erred by failing to make finding that mother's acts constituted "reprehensible conduct" and failing to determine whether to decline jurisdiction for that reason). As we noted, Mr. Gruber offered sufficient evidence to establish that Ms. Gruber may be equitably estopped from invoking a Maryland court's jurisdiction. We shall remand this case to the circuit court to determine whether Ms. Gruber engaged in deceptive misrepresentation or concealment that allowed her to win a jurisdictional battle that she anticipated. That is a first level factual finding that an appellate court cannot make. *See, e.g., In re Marriage of Nasica,* 12 Kan.App.2d 794, 758 P.2d 240, 244, *rev. denied,* 243 Kan. 778 (1988) ("whether a parent has engaged in wrongful or reprehensible conduct is a question of fact").

▇▇▇▇▇ If the court determines that Ms. Gruber came into court with unclean hands, in that she won the race to the courthouse by deceptive tactics, then the court must determine whether she should be denied access to our jurisdiction.[12] *See* § 9–208(a); *Malik,* 99 Md.App. at 531, 638 A.2d 1184. In doing so, it must evaluate whether the exercise of Maryland jurisdiction would be in Katarina's best interests notwithstanding her mother's misconduct. *See id.* at 532–33, 638 A.2d 1184. This is not an ordinary "best interests" decision, however. As we pointed out in *Malik v. Malik,* the parent who engaged in the reprehensible conduct bears the substantial burden of proving that the harm to the child from declining jurisdiction would outweigh the harm perpetrated by the deception. *See id.* at 525–34, 638 A.2d 1184. Only in "the most extraordinary circumstances" should that parent be per-

---

12. In the event that the circuit court declines to exercise jurisdiction, the Tennessee court may exercise jurisdiction. *See Brown v. Brown,* 847 S.W.2d 496, 500 (Tenn.1993) ("If Tennessee is not the child's 'home state,' a Tennessee court may assume jurisdiction only upon a finding that ... the 'home state' has declined to exercise jurisdiction and deferred to Tennessee as 'the more appropriate forum to determine the custody of the child' ").

mitted to obtain relief from a Maryland court. *See id.* at 525, 638 A.2d 1184. Unless the other forum state applies a law "so contrary to Maryland public policy as to undermine confidence in the outcome" of a custody proceeding, the circuit court should decline to exercise jurisdiction.[13] *See id.* at 534, 638 A.2d 1184. Given that Tennessee applies the best interest of the child standard to determine custody in accordance with UCCJA procedures, that Mr. Gruber expressed his desire to initiate legal action as early as June 18, and that Tennessee would have had exclusive and continuing home state jurisdiction if he had filed there before September 21, 2000, it appears that Ms. Gruber's burden would be a heavy one.

**JURISDICTIONAL ORDER OF MARCH 30, 2000 VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

13. For example, in *Malik,* we held that because the alternate forum in Pakistan did not use a "best interests of the child" standard to determine custody, there were "extraordinary circumstances" warranting the exercise of jurisdiction despite the mother's reprehensible conduct in wrongfully taking and concealing the children. *Malik v. Malik,* 99 Md.App. 521, 534–36, 638 A.2d 1184 (1994).