REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1394

September Term, 2013

SARA SUE DREXLER, et vir

v.

JENNIFER LYNN BORNMAN, et al.

Krauser, C.J.,
Meredith,
Woodward,

JJ.

Opinion by Krauser, C.J.

Filed: May 28, 2014

The Uniform Child Custody Jurisdiction and Enforcement Act (the "Act"),[1] provides that a court of a child's "home state" has exclusive jurisdiction to "make an initial child custody determination," with only two exceptions, which we shall later more fully acknowledge and which, in any event, are not relevant to the issue before us. A "home state" for a child six months or older, as we have here, is, according to the Act, "the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding."[2]

This appeal requires us to decide whether a seven-year-old child's week-long visit to Maryland, which interrupted his one-year-and-five-month residence in Indiana, was a "temporary absence" from Indiana or was, though brief, a change of residence that, in effect, prevented the aforementioned six consecutive month requirement from being met and thereby denied Indiana "home state" status. In addressing this issue, we must examine, among other things, what role the mother's short-lived intent to change her residence from Indiana to Maryland should play in making that determination.

This issue arose when Sara Drexler and Thomas Drexler, the maternal grandparents of Cameron Wright and residents of Maryland, filed a complaint, in the Circuit Court for Baltimore County, seeking custody of Cameron. The parents and

---

[1]Md. Code (1999, 2012 Repl. Vol.), §§ 9.5-101 through 9.5-318 of the Family Law Article ("FL").

[2] FL § 9.5-101(h).

current custodians of Cameron, Indiana residents Jennifer Bornman and Edward Wright, were named as defendants. At the time the Drexlers filed their custody complaint, Cameron was seven years old and was residing in Indiana. In dismissing the complaint upon the motion of Cameron's mother, the circuit court ruled that Maryland lacked jurisdiction over the custody dispute, because Indiana was Cameron's "home state." This appeal, by the Drexlers, followed.

## Background

Cameron was born in Indiana in July of 2005, to his mother, Jennifer Bornman and his father, Edward Wright. From his birth and until he was approximately eighteen months old, Cameron lived in Indiana with his parents. Then, in October of 2006, Cameron and his parents moved to Maryland, where they lived with the Drexlers, who are Cameron's maternal grandmother and maternal step-grandfather. Then, within "a couple" of weeks, Cameron's father moved back to Indiana while Cameron and his mother remained in Maryland with the Drexlers.

About three years and five months after relocating to Maryland, Cameron and his mother, moved back to Indiana in March of 2010. Less than a month later, however, Cameron's mother arranged for Cameron to return and stay with the Drexlers while she continued to live in Indiana. But, that arrangement ended when, fourteen-and-a-half months later, Cameron was returned to Indiana to live with his mother.

2

On March 25, 2012, while living in Indiana, Cameron's mother sent text messages to her sister, who lived with the Drexlers, informing her that she and Cameron were going to move, in the "middle or end" of April, back to Maryland to "stay." According to Cameron's mother, she wanted to change her residence because her relationship with her girlfriend had begun to "deteriorate." Then, on April 30, 2012, Cameron's mother texted her sister again, telling her that she had just informed her girlfriend and domestic partner that she was "leaving." A month later, after having spent about a year in Indiana, Cameron and his mother moved back to Maryland, leaving behind some of their belongings in storage. At that time, according to the testimony of Cameron's mother, she intended to "stay" in Maryland.

But, within a week of arriving in Maryland, Cameron's mother changed her mind, upon reconciling with her former girlfriend. She decided to return, with Cameron, to Indiana. Upon arriving back in Indiana on June 8th, Cameron first lived with his father and then, in October, moved in with his mother.

On November 20, 2012, the Drexlers filed a complaint, in the Baltimore County circuit court, seeking custody of Cameron. Cameron's mother responded with a motion to dismiss on the grounds that Maryland did not have jurisdiction because Indiana was Cameron's "home state," and, even if Maryland did have jurisdiction, the circuit court should decline to exercise its jurisdiction because Indiana was a more convenient forum. Following a hearing, the circuit court granted the motion of Cameron's mother and

3

dismissed the case, declaring that Indiana was Cameron's "home state" and that, therefore, Maryland lacked jurisdiction over the custody dispute. The Drexlers then noted this appeal.

**Discussion**

The Drexlers contend that Maryland did not lack jurisdiction because Indiana is not Cameron's "home state." Although Cameron and his mother had been living in Indiana for one year and five months before suit was filed, they claim that, because Cameron's mother brought Cameron to Maryland, in June of 2012, with the intent of living here permanently, Cameron's one-week stay in Maryland meant that he had not lived in Indiana for six "consecutive" months before their complaint was filed, as required by the Act's definition of "home state." As a consequence, Indiana is not Cameron's "home state," maintain the Drexlers.

Cameron's mother counters that her and her son's week-long stay in Maryland in June of 2012 was, under the Act, a "temporary absence" from Indiana, and, therefore, Cameron lived in Indiana continuously from June 14, 2011, up to the day that the Drexlers filed their complaint for custody one year and five months later, on November 20, 2012. And, because Cameron lived in Indiana "for at least 6 consecutive months, including any temporary absence, immediately before the commencement" of the

4

custody proceeding, his mother claims, Indiana is his "home state" and has exclusive jurisdiction over the custody dispute.

The purpose of the predecessor to the Act, the Uniform Child Custody Jurisdiction Act, among other things, was to "[a]void jurisdictional competition and conflict with courts of other states in matters of child custody." *Howard v. Gish*, 36 Md. App. 446, 450 (1977) (quoting Md. Code (1957, 1973 Repl. Vol, 1976 Cum. Supp.), Art. 16 § 184). To achieve that end, the Act[3] now provides that a child's "home state" has exclusive jurisdiction to "make an initial child custody determination." FL § 9.5-201; *see Toland v. Futagi*, 425 Md. 365, 373 (2012) (noting that the Act is consistent with the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A, which gives "exclusive jurisdiction to the home state, so as to avoid concurrent jurisdiction with another state"). There are, however, two exceptions to this statutory precept. They are: when the "home state" has declined to exercise its jurisdiction, FL § 9.5-201(a), or when a "child is present in this State" and has been abandoned or is need of protection "because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse," FL § 9.5-204(a).

But what constitutes a child's "home state"? For a child less than six months old, it is the state "in which the child lived from birth." But, for a child more than six months

---

[3]Like Maryland, Indiana (as well as forty-seven other states), has adopted the Uniform Child Custody Jurisdiction and Enforcement Act. *See* Ind. Code Ann. §§ 31-21-1-1 through 31-21-7-3 (LexisNexis 2013).

old, such as Cameron was at the time the Drexlers initiated their lawsuit, it is a state in which the child lived for six consecutive months before the commencement of the proceeding. Any "temporary absence" of the latter child, from the state in which he or she has been living, counts as part of that six-month period. Specifically, the Act states:

> (h) "Home state" means:
>
>> (1) the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding; and
>>
>> (2) in the case of a child less than 6 months of age, the state in which the child lived from birth with any of the persons mentioned, including any temporary absence.

FL § 9.5-101(h).

Although Cameron's mother maintains that, during the six months preceding the commencement of the Drexlers' custody suit, she and Cameron lived in Indiana, the Drexlers claim that Cameron's period of residency in Indiana ended, before the prerequisite six months had passed, when Cameron and his mother moved to Maryland from Indiana with the intention of living in Maryland and, thereafter, resided in Maryland for one week before returning to Indiana permanently. Hence, the Drexlers would have us conclude that Cameron and his mother did not live in Indiana for "at least 6 consecutive months, including any temporary absence, immediately before the commencement" of the custody action they filed.

6

Thus, the question before us is whether Cameron's week-long stay in Maryland was a "temporary absence" from Indiana and thus can be counted as part of the six months for determining Cameron's "home state" or whether that stay effectively terminated Cameron's Indiana residence. We begin our resolution of this issue with the acknowledgment that there are no Maryland appellate decisions that address what test or what factors are to be considered in making that determination.[4] The Drexlers urge us to adopt a "totality of the circumstance" test that includes considering that Cameron's mother intended to stay in Maryland when she returned to Maryland in June of 2012. While we agree with the Drexlers that a "totality of the circumstance" test is a useful tool in deciding whether Cameron's stay in Maryland was a "temporary absence," we disagree with their conclusion that, under that test, Indiana could not have been found to be Cameron's "home state."

Other states, which have adopted the Uniform Child Custody Jurisdiction and Enforcement Act, have apparently employed a number of different tests in determining whether an out-of-state stay was a "temporary absence" for the purposes of the Act's "home state" provision, as noted by the Court of Appeals of North Carolina, in *Chick v.*

_____

[4]In *Gruber v. Gruber*, 141 Md. App. 23 (2001), *rev'd on other grounds*, 369 Md. 540 (2002), though asked by the appellant to adopt a totality of the circumstance test that included consideration of whether a parent intended a move to be permanent when relocating to a different state, we found it unnecessary to enunciate any test to determine whether a stay in another state was temporary as, "[e]ven when viewed under the legal standard most favorable" to appellant, his contention that the out of state stay was a temporary absence failed. *Id.* at 45.

7

*Chick*, 164 N.C. App. 444 (2004). There, the North Carolina intermediate appellate court observed that there are principally three tests that the courts of other states have used in resolving the "home state" absence issue. They have, observed that appellate court, approached this problem by either: "(1) looking at the duration of absence, (2) examining whether the parties intended the absence to be permanent or temporary, [or] (3) adopting a totality of the circumstances approach." *Id.* at 449.

We agree with those state appellate courts that have concluded that the proper way to determine if a child's absence from a state is a "temporary" one, under the Act, is to examine all the circumstances surrounding that absence;[5] in other words, a totality of the circumstances test. Such an approach would encompass both the duration of the absence and whether the parties intended the absence to be permanent or temporary, as well as "additional circumstances that may be presented in the multiplicity of factual settings in which child custody jurisdictional issues may arise," *Chick*, 164 N.C. App. at 450. This test, we believe, provides courts with the necessary flexibility in making this determination. Other tests or approaches, such as looking only at the length of the absence, would, as the Illinois intermediate appellate court pointed out, discourage parents from entering into "agreements providing for extended out-of-state visitations." *In re Marriage of Richardson*, 255 Ill. App. 3d 1099, (1993).

---

[5]*See, e.g.*, *In re Marriage of Richardson*, 255 Ill. App. 3d 1099 (1993); *In re S.M.*, 938 S.W. 2d 910 (Mo. Ct. App. 1997); *Chick v. Chick*, 164 N.C. App. 444 (2004); *In re Marriage of McDermott*, 175 Wash. App. 467, *cert. denied*, 179 Wash. 2d 1004 (2013).

A review of the totality of the circumstances surrounding Cameron's June of 2012 week-long stay in Maryland, leads us to conclude that that stay was a "temporary absence" from Indiana and, therefore, Indiana was, under the Act, his "home state." The most striking aspect of that stay is its brevity: Cameron was only in Maryland for seven or eight days before he and his mother returned to Indiana, whereas, prior to their short-lived stay in Maryland, Cameron had resided continuously in Indiana for almost a year, and, by the time the Drexlers filed their child custody action, Cameron had resided in Indiana, notwithstanding his week-long trip to Maryland, for about one year and five months.[6]

Moreover, as Cameron's mother points out, Cameron's absence from Indiana is shorter than a similar type of absence in *Olson v. Olson*, 64 Md. App. 154 (1985), where we concluded that, notwithstanding a three-week absence from Maryland, Maryland was the "home state" of the Olsons' children. The parties to that case, Kathleen W. Olson and Larry S. Olson, had two children and lived in Rhode Island. After they divorced, Mr. Olson and the couple's children moved to Maryland while Mrs. Olson continued to reside in Rhode Island. For four weeks each summer, however, the children stayed with Mrs. Olson at her Rhode Island address.

---

[6]Cameron had previously resided in both Indiana and Maryland. While the time periods he spent in each state might be relevant if the issue was Cameron's "significant connection" with either state, they are not relevant to our consideration of whether his June 2012 stay in Maryland was a "temporary absence" from Indiana.

9

When, after taking the children, in June, to Virginia for three weeks and then again in August, she informed Mr. Olson that she was going to take the children to Rhode Island for the remainder of the summer, Mr. Olson asked her to agree in writing that the children would be returned to Maryland before school began. Upon Mrs. Olson's refusal to agree to that condition, Mr. Olson obtained an injunction, in the Circuit Court for St. Mary's County, prohibiting Mrs. Olson from removing the children from Maryland and ordering the sheriff to obtain physical custody of the children and return them to Mr. Olson. Mrs. Olson was served with that injunction when she and the children briefly returned to Maryland, but it was then "dissolved" following a hearing. In the meantime, Mr. Olson petitioned the Maryland circuit court to modify a Rhode Island custody decree, a decree to which the parents had previously agreed. Mrs. Olson responded with a motion to dismiss this petition on the grounds that Maryland lacked jurisdiction over the custody issue.

When the circuit court granted that motion, Mr. Olson noted an appeal, claiming that Maryland had jurisdiction over the custody dispute. This Court agreed, noting that the children had lived with Mr. Olson in Maryland for the past five years, and the children's recent three-week absence from Maryland, while they were with their mother in Virginia, did not affect Maryland's status as their "home state." *Id.* at 163. In contrast, the child at issue in this custody dispute—Cameron—was absent from Indiana for just a week.

10

Moreover, the fact that, at the time Cameron and his mother left Indiana, Cameron's mother intended to "stay" in Maryland is relevant but hardly dispositive of the issue. To begin with, while a parent's intent is a factor to be considered in addressing the "home state" issue, a parent's intent is not afforded, we note, the same heavy weight that it is given in determining a person's domicile. As another appellate state court aptly put it: "Whether a State is a person's domicile is primarily a question of that person's intent; whether a State is a child's 'home State' is primarily a question of time." *In re Marriage of Schoeffel*, 268 Ill. App. 3d 839, 842 (1994).

Furthermore, while Cameron's mother had initially decided to change her and Cameron's residence from Indiana to Maryland, her decision to do so was obviously tentative, seemingly impulsive, and completely dependent upon what future course her relationship with her then former girlfriend took. Indeed, the only reason given by Cameron's mother as to why she had decided to leave Indiana for Maryland was that her domestic partnership had begun to "deteriorate." When, within days of arriving in Maryland, the two women reconciled, Cameron's mother evidently regretted her decision to leave Indiana for Maryland, and, about a week after arriving in Maryland, made arrangements to return to Indiana with Cameron, which she promptly did.

Finally, we observe that, during their brief visit to Maryland, Cameron's mother, apparently, took no steps to finalize or formalize her intent to stay in Maryland. There is no evidence that she intended to apply for a Maryland driver's license or identification

11

card; register to vote in Maryland; or to inform any service providers, such as a bank, health insurance company, or telephone company, that she had moved to Maryland. Indeed, she had not even completed her "move" to Maryland, as she had left some of her belongings behind in a storage unit in Indiana. Although her failure to take any of these actions is understandable in light of the brevity of her Maryland visit, the absence of any indication or manifestation of her intent to take any of these steps only underscores the tentative nature of her intent.

We, therefore, conclude that Cameron's stay in Maryland for a week in June of 2012 ultimately amounted to no more than a "temporary absence" from Indiana, where he and his mother had—except for that absence—lived continuously for approximately one year and five months, and thus we find that Indiana meets the criteria of a "home state" under the Act. Consequently, Indiana, as Cameron's "home state," has jurisdiction over this matter, and Maryland does not.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

12