REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 400

September Term, 2015

_____

NAFISSATOU GARBA

v.

ALIOUNE NDIAYE

_____

Krauser, C.J.,
Nazarian,
Reed,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: February 26, 2016

The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") eliminates jurisdictional wrangling and forum shopping in custody cases by defining, for each child, a "home state" that has exclusive jurisdiction to make initial custody decisions. The young boy at the heart of this case has had a peripatetic life—his parents, both native to foreign countries, lived in Maryland, then New York, and he traveled for extended periods with his mother to her job assignments in several African countries while his father remained here. The Circuit Court for Montgomery County found that Maryland is the boy's home state and, after an evidentiary hearing, granted sole legal and physical custody to his father. His mother, who filed the case in Montgomery County in the first place, disputes the court's threshold finding and asks us to hold that Ethiopia is his home state (foreign countries can be home states too). This case presents a trickier-than-usual application of the UCCJEA's process for assigning a home state, but we agree with the circuit court's decision and affirm.

## I.    BACKGROUND

The facts underlying the parents' marriage, divorce, and custody dispute are colorful and hotly disputed, but the only facts relevant to the issues before us relate to the whereabouts of their son, B.[1]

The appellee, Alioune Ndiaye (the "Father"), is a native of Senegal, and the appellant, Nafissatou Garba (the "Mother") a native of Niger, and both are United States

---

[1] To protect the identity of the child, we use only his first initial.

citizens.[2] They lived first in an apartment, then a home they owned, and worked in Montgomery County.[3] They vacationed to Niger to marry in 2008, and shortly thereafter Mother accepted a job with the United Nations. Her first assignment was in New York City; she, Father, and her son, M.,[4] relocated to New York City, but maintained their Maryland residences and returned to Maryland every weekend.

From there, Mother took a year-long field assignment in Guinea-Bissau, and she moved there alone in April 2010. Father remained in Maryland, living with Mother's mother and M., but visited Mother in Guinea-Bissau, where they conceived B., their first and only child together. To receive the favorable maternity leave offered to United Nations employees, the parents agreed that Mother should renew her annual contract to remain at her job in Guinea-Bissau, but return to Maryland at the conclusion of that second year. From there, however, the parents' relationship began to decline.

---

[2] Father moved from Senegal to Maryland in 1989 and attained United States citizenship in 1997. The timing of Mother's immigration from Niger to Maryland is less clear in the record, but at the time of their marriage, Mother was a permanent resident of the United States, and has since become a citizen.

[3] Father testified that, around the time of their marriage, their combined income was around $200,000.

[4] M. is Mother's son from another relationship. Father testified, though, that he "took on the role of father" and did "[e]verything a father would do" with M. Father also has children from other relationships.

B. was born in Maryland in 2011, and has lived in many places during his young life:[5]

- *September 9, 2011*: Mother left Guinea-Bissau to give birth to B. in Maryland.

- *January 2012*: Mother and B., then four months old, left Maryland for Guinea-Bissau. In September, Mother filed for voluntary separation.

- *April 6, 2013*: Mother and B. moved to Ethiopia for Mother's new field assignment.

- *August 2013*: Mother sent B. to Maryland to celebrate his second birthday with Father. Father, though, was in Senegal, and did not see B. Instead, B. stayed with Mother's mother (at Mother's house in Maryland) until Mother could join B. in the United States.

- *November 24, 2013*: Mother and B. returned to Ethiopia.

- *January 11, 2014*: Mother and B. returned to Maryland to visit M. for M.'s 15th birthday.

- *February 7, 2014*: Mother and B. returned to Ethiopia.

  That same day, Mother filed a *verified* complaint[6] in the circuit court, seeking an absolute divorce from Father and sole physical and legal custody of B. She stated that she was "domiciled in the State of Maryland and ha[d] been living in the State of Maryland for more than 12 months prior to the filing of this Complaint." She listed a Montgomery County address as her address. Father answered and filed counterclaims, including a motion to dismiss based on Mother's failure to file financial statements. The court dismissed the complaint, but Father's counterclaim

---

[5] Each separate bullet represents B.'s movement between countries, and we have filled in the gaps with dates and information regarding court proceedings or the parents' movements.

[6] As required, her notarized verification states that "I, Nafissatou S. Garba, being duly sworn under oath, depose and say that I have read and understand the contents of the Complaint and that the contents are true to the best of my knowledge, information and belief."

3

for divorce and custody proceeded.  In August, and in parallel, Mother sought an *ex parte* divorce and custody in Niger, and on September 16, 2014, the Nigerien court granted divorce and sole physical and legal custody to Mother.

- *October 5, 2014*: Mother and B. traveled to Maryland.  On October 13, Mother applied for a visa for Sudan so she could undertake a new United Nations assignment.  Her initial Sudanese assignment would be in Darfur, but since it was a non-family mission, B. could not go with her.  Mother enrolled B. in a Maryland preschool on October 14, 2014,[7] and he started school on October 21.  On October 26, Mother returned to Ethiopia, while B. remained in Maryland with Mother's mother.  Mother came back to Maryland on November 14, 2014, then went back to Ethiopia in November.

  On December 2, 2014, the Circuit Court for Montgomery County held a *pendente lite* hearing and subsequently ordered temporary sole physical and legal custody to Father.

- *December 12, 2014*: Mother's mother took B. to Niger.  There is conflicting testimony as to which day B. left school,[8] but it is undisputed that Mother called the school on December 15 stating that B. was out of the country due to an emergency.  On December 16, Mother relocated to Darfur, Sudan.

  Also on December 16, Father filed a report with the Montgomery County Police Department alleging that Mother had illegally removed B. from the United States.  Detective Kevin Conroy investigated the complaint and maintained email contact with Mother throughout the investigation.  During the email conversations, Detective Conroy explained to Mother that the circuit court had granted temporary custody to Father.  Mother initially complained that she wasn't served with the order, then claimed the court order didn't apply to her because B. had often lived

---

[7] The principal of the preschool testified at trial.  There is conflicting testimony as to whether Mother signed B.'s enrollment contract on October 14 or 15, but the difference doesn't matter for our purposes.

[8] The school principal testified that B. was last seen at the school on Friday, December 12. Mother testified that the principal was lying, and that B. left for New York (presumably to fly from New York to Niger) early in the morning of December 11.

4

outside of the United States. Eventually, Mother disclosed that B. was in Niger with her mother and agreed to bring him to the United States on February 12, 2015.

Meanwhile, on December 29, Mother filed for a Sudanese visa for B. using his United States passport. She had recently requested a transfer to Khartoum, Sudan at a family mission site where B. could join her. Mother responded on January 29, 2015 to Father's claims for divorce and custody in the circuit court, and moved to vacate the *pendente lite* custody order.[9] On February 6, 2015, Mother again filed for a Sudanese visa for B., this time using his Nigerois passport because the prior request was taking too long.

- *February 12, 2015*: Mother and B. returned to Maryland. Father immediately took physical custody of B., and B. has since been living with Father.[10]

On March 6, 2015, the circuit court held a hearing on Mother's January 29 motion to vacate the *pendente lite* order. At that time, Mother was living in Darfur, and the court denied her motion. A trial on the merits was held on March 23-24 and April 15-16,[11] and on May 4, 2015, the circuit court ordered sole physical and legal custody to Father.[12] The court found, among other things, that Mother listed a Germantown address as her address

---

[9] The court had entered default against Mother on September 30, 2014 for failure to respond to Father's July 7, 2014 counterclaims. Mother successfully petitioned to vacate the order of default on February 13, 2015.

[10] Mother and Father testified that Father took physical custody on February 13, 2015. At the time of their testimony, B. remained with Father. During oral argument on December 4, 2015, the parties stipulated that B. was still in the physical custody of Father.

[11] Mother testified at trial on March 24, April 15, and April 16.

[12] The court ordered Mother to pay $10,000 toward Father's attorneys' fees and to pay child support of $800 per month. She has not challenged those decisions here, except to the extent they are subsumed in the jurisdictional question.

5

(a house that she owned and still owns), that she pays taxes in Maryland and the United States, that she has no fixed address when she is on assignment in Africa, and that her missions to Africa were temporary, and in the nature of military deployments. Mother filed a timely Notice of Appeal.

## II. DISCUSSION

Mother challenges the circuit court's decision that Maryland is B.'s "home state" under the UCCJEA. If she's right, the circuit court lacked jurisdiction to make the initial custody determination at all. *See Drexler v. Bornman*, 217 Md. App. 355, 360 (2014). Instead of Maryland, Mother contends that Ethiopia is B.'s "home state" because he had been living in Ethiopia for almost a year at the time Mother filed for a custody determination.[13]

Father frames the issue, correctly, as "whether the court's determination that Maryland is the home state is clearly erroneous." From there, though, he points us to the Hague Convention of 25 October 1980 on the Civil Aspects of International Child

---

[13] Mother phrased the issue in her brief as follows:

> Did the trial court have subject matter jurisdiction to make an initial child custody determination under UCCJEA § 9.5-201 when Ethiopia was the "home state" of the child under UCCJEA § 9.5-201(h) because the child had lived in Ethiopia with Appellant, his mother, beginning April 16, 2013, nearly a year before Appellant commenced this action on February 7, 2014?

Abduction (the "Hague Convention") and characterizes the "threshold issue" as "whether the parents had a shared intention for the child's Country of Habitual Residence… [to be] the United States of America or Ethiopia."[14] He describes the UCCJEA as "a [c]hoice of [f]orum [s]tatute and not an [e]xclusive [j]urisdiction [s]tatute." And he argues that the Ethiopian courts could not exercise jurisdiction in any event because no proceedings had been initiated there, because Mother's relocation to Sudan foreclosed the possibility of proceedings in Ethiopia now, and because any Ethiopian court decree would be unenforceable here because "only religious courts following Sharia may hear family law matters."[15]

---

[14] The circuit court was not asked to decide whether Mother abducted B., and so no such issue is before us. We recognize that Father offers the Hague Convention as an analogue to help resolve cross-border UCCJEA cases like this, but as we will explain, we disagree that the potential involvement of other countries changes the threshold legal question.

[15] The potential applicability of Sharia—Islamic law—ultimately is irrelevant. But although we don't purport to have conducted a thorough analysis of Ethiopian law, Father's claim that family law matters can only be decided in religious courts in Ethiopia appears on its face to be wrong. His own source, an introduction to the Ethiopian legal system, recognizes that there is "formal legal pluralism" between civil and religious courts in family law matters. *See* Girmachew Alemu Aneme, Introduction to the Ethiopian Legal System and Legal Research, (published August/September 2010), § 2.2.5, at http://www.nyulawglobal.org/globalex/Ethiopia.html#religiouscourts. That overview does not say, however, that religious courts have exclusive jurisdiction. And, to the contrary, the Ethiopian federal legislature passed a civil Family Code in 2000 that recognizes civil *and* religious marriages (as well as "irregular unions") and, among other things, provides that "[f]rom the time the petition for divorce is brought before it, the court shall forthwith give appropriate order regarding the maintenance of the spouses, the custody and maintenance of their children and the management of their property." The Revised Family Code Proclamation, Federal Negrit Gazetta, Extra Ordinary Issue No. 1/2000, Article 82(2)(5), http://www.refworld.org/pdfid/4c0ccc052.pdf.

7

Because this case turns on the interpretation and application of Maryland constitutional, statutory, or case law, "[this] Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *See Schisler v. State*, 394 Md. 519, 535 (2006).

**A.    B. Was Physically Present In Maryland At The Time Of Filing And For Most Of The Preceding Six Months.**

Effective October 1, 2004, Maryland adopted the UCCJEA as Title 9.5 of the Maryland Family Law Article ("FL") (1999, 2006 Repl. Vol.). This enactment replaced the Uniform Child Custody Jurisdiction Act ("UCCJA"), FL § 9-223 (1984, 1999 Repl. Vol.). Comment to Section 1 of the UCCJEA borrows language from the UCCJA and delineates the uniform law's overarching goals:

> (1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;
> (2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;
> (3) Discourage the use of the interstate system for continuing controversies over child custody;
> (4) Deter abductions of children;
> (5) Avoid relitigation of custody decisions of other States in this State; [and]
> (6) Facilitate the enforcement of custody decrees of other States.

UCCJEA, 9 Part 1A U.L.A. § 101, cmt. (1999).

8

Under the UCCJA, there was no hierarchy among the potential bases for jurisdiction, so courts in different states could simultaneously exercise jurisdiction and parties could forum-shop. The UCCJEA remedied this problem by providing that the child's "home state" has exclusive jurisdiction to make initial custody determinations. In so many words, a court of this State has jurisdiction to make an initial child custody determination only if:

> this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State.

FL § 9.5-201(a)(1).[16]

The UCCJEA defines the child's "home state" as "the State in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding." FL § 9.5-101(h)(1). The Act does not define the term "lived," although courts generally have construed it to mean the place where the child is "physically present" and distinguished it from the legal concept of domicile. *See, e.g.*, *Powell v. Stover*, 165 S.W.3d 322, 326 (Tex. 2005); *In re Marriage of Rhoads*, 209 S.W.3d 24, 29 (Mo. Ct. App. 2006) ("The phrase 'lived with' is a commonplace term having no technical meaning, and

---

[16] There are two exceptions to this rule that don't apply in this case.

9

it means literally what it says. It refers to the child's physical presence in a state without regard for the child's legal residence or domicile." (internal quotations and citations omitted)). If there is a home state, then no other state may exercise jurisdiction to make an initial custody order. FL § 9.5-201(a); *see Toland v. Futagi*, 425 Md. 365, 373 (2012) (noting the consistency between the UCCJEA and the Parental Kidnapping Prevention Act, 28 U.S.C. 1738A, which gives "exclusive jurisdiction to the home state, so as to avoid concurrent jurisdiction with another state"). And as we explain below, we agree with the circuit court that Maryland is B.'s home state under these circumstances.

Mother filed her complaint on February 7, 2014, the day she and B. returned to Ethiopia after visiting M. for his birthday, so on the day of filing, B. *was* physically present in Maryland. During the preceding six months, B. and Mother traveled back and forth twice between Ethiopia and Maryland for birthday celebrations; of those six months, B. spent at least four in Maryland. [17] At that most fundamental level, then, B. was physically in Maryland for the greatest amount of time during the six months prior to Mother's filing, whether we measure that in consecutive (three to four months) or cumulative (four to five months) terms.[18]

---

[17] Mother has never initiated a custody proceeding, civil or religious, in Ethiopia.

[18] During the six months leading up to Mother commencing this action on February 7, 2014, B. was only in Ethiopia for a short time. The record states that B. left Ethiopia to come to Maryland for his second birthday, and remained here until November 24, 2013; the record indicates that he arrived here in August 2014, but not the exact date. The record also reflects that he was in Ethiopia from November 24, 2013 to January 11, 2014.

These facts alone, however, don't necessarily solve the issue. B. was not *continuously* present in Maryland during the six months prior to Mother's complaint. And Mother takes the position that she and B. lived in Ethiopia and only visited Maryland during this time period, not the other way around. Putting aside, for the moment, Mother's sworn statement in her complaint that she lived in Maryland at the time of filing, we must determine next whether B.'s visits here between August 2013 and February 2014 were visits from his home in Ethiopia or whether his trips to Ethiopia were "temporary absences" from his home here in Maryland.

## B. B.'s Overseas Stays Were Temporary Absences.

The UCCJEA does not define "temporary absence" for purposes of FL § 9.5-101(h)(1), but courts have developed three tests to determine whether absences are temporary or permanent: duration, intent, and totality of the circumstances. Some courts focus solely on the length of the absence. Other courts consider the intent of the parties, specifically whether parties intended to be away for a limited amount of time and which state they viewed as their place of permanent domicile.

---

After filing the complaint, Mother returned to Ethiopia for eight months before again returning to Maryland. Upon returning, Mother enrolled B. in a Maryland preschool, where he remained until his grandmother transported him to Niger, and then Mother moved B. to Darfur. This latter stint in Ethiopia is not relevant to the home state analysis, though, because it occurred after Mother filed her complaint in Maryland. And even if it were, Mother's decision to enroll B. in a Maryland preschool, which we also have not considered, would have come into play as well.

11

This Court has adopted a more flexible approach. In *Drexler v. Bornman*, 217 Md. App. 355, *cert. denied*, 440 Md. 116 (2014), we "agree[d] with those state appellate courts that have concluded that the proper way to determine if a child's absence from a state is a 'temporary' one, under the [UCCJEA], is to examine all of the circumstances surrounding that absence." *Id*. at 362. In that case, the child bounced between Maryland and Indiana throughout his life, and lived in Indiana for a year and five months prior to the child custody action, which was filed in Maryland by the mother's parents. *Id.* at 357, 359. Within six months of the filing, the mother and child spent a week in Maryland, and we were asked to decide if that absence from Indiana was temporary. *Id.* at 357. Testimony revealed that the mother wanted to move from Indiana because her "relationship with her girlfriend had begun to 'deteriorate,'" and that the mother and child did move to Maryland, but left some personal items in Indiana in storage. *Id.* at 358. Although the grandmother testified that the mother intended to stay in Maryland at the time of her move, the mother reconciled with her former girlfriend within a week after relocating, and so the mother and child returned to Indiana. *Id.* at 358-59.

After weighing the different approaches other states had taken to the question, we adopted a totality of the circumstances test to "examine all the circumstances surrounding [the] absence," an analysis that encompasses these considerations: "the duration of the absence and whether the parties intended the absence to be permanent or temporary, as well as 'additional circumstances that may be presented in the multiplicity of factual settings in which child custody jurisdictional issues may arise.'" *Id.* at 362 (quoting *Chick*

12

*v. Chick*, 164 N.C. App. 444, 450 (2004); *id.* at 362 n.5 (citing *In re Marriage of McDermott*, 175 Wash. App. 467 (2013); *In re S.M.*, 938 S.W.2d 910 (Mo. Ct. App. 1997); *In re Marriage of Richardson*, 255 Ill. App. 3d 1099 (1993)). We embraced this approach over more rigid tests because it "provides courts with the necessary flexibility" to make child custody jurisdiction determinations, *Drexler*, 217 Md. App. at 363, and to assign the appropriate weight to each factor.[19]

The question in this case turns less on the relative duration of B.'s time in Maryland—which, as a percentage, was much greater than the time the child in *Drexler* spent here, *id.*—than on the reason *why* Mother, and thus B., was absent from Maryland. Purpose is different than intent, a subjective concept that we found less compelling in *Drexler*. *See id.* at 634 (finding the mother's move from Indiana to Maryland "obviously tentative, seemingly impulsive, and completely dependent upon what future course her relationship with her then former girlfriend took"). To the contrary, we can see the purpose of Mother's travels in this case from the objective and undisputed facts before the circuit court. *See* Andrea Charlow, *There's No Place Like Home: Temporary Absences in the UCCJEA Home State*, 28 J. AM. ACAD. MATRIM. LAW 25, 47-49 (2015) ("Although purpose may not always be easy to ascertain, objective criteria could be used to determine whether, at the time the action was commenced, the child was absent for a visit, vacation,

---

[19] Courts may examine these factors in any order, and the order doesn't necessarily indicate a factor's relative weight.

or for a short period for some other purpose that would indicate the absence is temporary . . . . Eliminating investigation into the mental state of the parents should simplify the inquiry."). Mother owns (and never sold) a house in Maryland, pays taxes in Maryland, and leaves Maryland for work. Mother's postings to Africa are a fundamental feature of her job with the United Nations and are, by design, temporary—she went to each country for a year at a time, each assignment was finite in duration, and Mother has been posted to at least three different countries over the life of this case. Mother's absences from Maryland (incidentally, the state she claimed in this complaint as her domicile) flowed from the structure of her employment, and there is no suggestion in this record that she planned to change careers or not to return to Maryland.

We noted as well in *Drexler,* in rejecting the mother's claim that she intended to move to Maryland, that the mother "took no steps to finalize or formalize her intent to stay in Maryland." *Drexler*, 217 Md. App. at 365. Here, Mother took no steps to finalize or formalize her intent to *leave* Maryland. She had an apartment and driver's license in Ethiopia, and she has dwellings and driving privileges in several countries (United States, Ethiopia, Sudan, and Niger). Moreover, her apartment in Ethiopia was rented, while her homes in Maryland and Niger are owned. She has citizenship in the United States and Niger, but not in Ethiopia. She has Maryland-based bank accounts and pays Maryland taxes. Her mother, sister, older son, and ex-husband all live in Maryland, and she sent B. to spend birthdays with his Maryland family. Mother returned to Maryland frequently even when she lived in New York City, and also from Guinea-Bissau to give birth. And most

14

strikingly, Mother originated this action in Maryland courts, specifically in Montgomery County where she owns her home, touting her Maryland residency as the basis for jurisdiction.[20]  Viewed in totality, we agree with the circuit court that the circumstances of this case support a finding that Mother's (and, therefore, B.'s) absences during the period before filing were temporary, and therefore that Maryland is his home state for purposes of the UCCJEA.  And because the home state finding is the only decision that Mother challenges on appeal, we need not address the merits of the court's custody ruling or any other aspect of this divorce proceeding.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[20] Mother also initiated divorce and custody proceedings in Niger, where they were married, and told the Niger courts that she lived in Maryland.