[Cite as *V.K. v. K.K.*, 2022-Ohio-1661.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| V.K., | : | |
| Plaintiff-Appellant, | : | |
| | | No. 109801 |
| v. | : | |
| K.K., | : | |
| Defendant-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 19, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-19-375339

### *Appearances:*

Jonathan A. Rich and Christopher R. Reynolds, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Plaintiff-appellant V.K. ("Father") appeals from the judgment of the Cuyahoga County Common Pleas Court, Domestic Relations Division, dismissing Father's complaint for custody of his and defendant-appellee K.K.'s ("Mother") minor child, A.K., for lack of subject-matter jurisdiction. For the reasons set forth below, we affirm.

## I. Factual and Procedural History

{¶ 2} In April 2011, Father moved from India to Lakewood, Ohio on an H-1B visa and began working as an IT consultant. Four years later, on November 14, 2015, Father and Mother ("the parties") were married in India. The parties agreed that they would live together in the United States. Mother obtained a visa that was contingent on Father's visa and moved into a condominium that Father had been renting in Lakewood.

{¶ 3} In August 2016, Mother, a dentist in India, enrolled at Cleveland State University, beginning a Ph.D. program in biology and teaching classes for a stipend as part of that program. In February 2017, the parties purchased a condominium in the same building where they had been renting.

{¶ 4} On October 24, 2017, the parties' child, A.K., was born in Ohio and is a United States citizen. A.K. was born with clubfeet, which required corrective casting for the first few months of his life and braces thereafter. Two months prior to A.K.'s birth, Mother's mother ("Maternal Grandmother") moved in with the parties to help Mother during her pregnancy and remained with the parties another four months after A.K.'s birth to help Mother care for A.K. After A.K.'s birth, Father's parents ("Paternal Grandparents") visited the parties for 15 days, during which the parties agreed to attend a wedding for Father's sister on March 7, 2018, in India. Mother's parents ("Maternal Grandparents") were invited to attend the wedding.

{¶ 5} In late February 2018, the parties, A.K., and Maternal Grandmother traveled together to India. Father had purchased round trip tickets for the parties and A.K. and a one-way ticket for Maternal Grandmother. They departed Cleveland on February 21, 2018, and arrived in Delhi the following day. The parties and A.K. were scheduled to return to Cleveland on March 18, 2018. Because A.K. is an American citizen, Father also obtained a two-month visitor's visa for A.K. to travel to India.

{¶ 6} The parties disagree about what happened when they arrived at the Delhi airport. Father alleged that Mother's father ("Maternal Grandfather") had planned to pick up Mother, A.K., and Maternal Grandmother at the Delhi airport and take them to stay at their family home in Karnal, and that Father would travel by bus to his family home in Kapurthala, located between six and seven hours by road from Karnal. Mother alleged that she and Father were planning to stay at Father's family home in Kapurthala and Maternal Grandmother would return with Maternal Grandfather to their home in Karnal. Mother alleged that after they arrived at the airport, she and Father argued, Father left her and A.K. at the airport, and Mother proceeded with A.K. and Maternal Grandparents to their family home in Karnal.

{¶ 7} Three days later, on February 25, 2018, Father traveled to Karnal to pick up Mother. The two traveled back to the Delhi airport, departing for Chennai on a short vacation and to attend a visa extension interview scheduled for February 27 at the United States Consulate in Chennai. The consulate informed the

parties that once their visas were approved, they could pick up their stamped passports at a regional office located in Jalandhar, near Father's family home in Kapurthala. After their trip to Chennai, Father dropped Mother off at her family home in Karnal and, after a brief visit, returned to Kapurthala.

{¶ 8} The parties' next recorded conversation occurred by text message on March 6, 2018, the day before Father's sister's wedding. Mother produced the text message in evidence. Father stated that he had been using a temporary SIM card in his cell phone while in India and lost all his text messages when he switched SIM cards prior to leaving India. In this text message, Mother asked about the status of their passports. Father replied that he had already picked up his passport but could not get Mother's without her written authorization or presence, adding that her passport would be held in Jalandhar until March 18. Sometime before March 18, Mother traveled to Jalandhar without Father to get her passport. Mother alleged that Father cancelled his plan to pick her up for the wedding, forcing her to ask Maternal Grandfather to drive her to the wedding. Father alleged that Mother became angry when she learned that Father had gotten only his own passport and that subsequently, Mother threatened to ruin the wedding.

{¶ 9} That same day, March 6, Mother traveled with her parents and A.K. between six and seven hours from Karnal to Kapurthala, where Father's family was hosting a Ladies Sangeet, a prewedding celebration. As soon as Mother's family arrived that evening, an argument between the families broke out in the street outside Father's family home. During the argument, Mother requested and

obtained A.K.'s passport from Father.  Attempting to broker peace, a neighbor invited representatives of both families to his house but could not reach a resolution. The following morning, March 7, Paternal Grandfather filed a complaint at a Kapurthala police station, requesting a restraining order to prevent Mother from interfering with the wedding.  The next day, March 8, Maternal Grandfather filed a complaint at a Karnal police station, alleging domestic violence against Father.

{¶ 10} On March 10, 2018, Father returned to the United States, a week before the family's prescheduled March 18 departure.  On March 12, 2018, Mother emailed Father's employer, requesting that "strict action" be taken against Father for abandoning Mother and A.K. in India, but subsequently withdrew the request following a family compromise.  On March 24, 2018, Mother filed an application with the Bureau of Immigration in India to convert and extend A.K.'s visa for 18 years, listing the reason for the extension as "father fled to U.S., abandoning mother and child in India."  The visa was extended for one year.

{¶ 11} On March 25, 2018, representatives of both families held a mediation at the Karnal police station to resolve their dispute.  Neither Father nor Mother attended.  The mediation resulted in a family compromise that each side would dismiss its complaint against the other and Father would return to India on or before April 20, 2018, to take Mother and A.K. back with him to Ohio.  Father did not return as agreed.  For the next several months, Mother and Father communicated by phone and text message.  During this time, Father promised to return to India to get

Mother and A.K. but claimed that he could not get time off work or could not leave in the middle of a project.

{¶ 12} On November 22, 2018, Mother filed a complaint at the Karnal police station against Father, Paternal Grandparents, and three other family relations, alleging physical abuse, threats, abandonment, and dowry harassment.

{¶ 13} In early February 2019, Mother returned to Ohio with A.K. and Maternal Grandmother and found that Father had the locks changed on their Lakewood condominium. On February 5, 2019, Father filed a complaint for divorce in Cuyahoga County, requesting temporary and permanent allocation of parental rights and responsibilities and restraining orders preventing Mother from returning to the condominium and from leaving the state with A.K. Father alleged in the parenting affidavit attached to his complaint that he was unaware of any pending proceedings related to domestic violence. Father also alleged in an affidavit that he attached to his request for the restraining orders that Mother "refused to return to Ohio or allow [Father] to take [A.K.] back to Ohio." The trial court granted Father's request for the restraining orders the same day.

{¶ 14} On February 22, 2019, Maternal Grandfather filed a second complaint on behalf of Mother and through counsel in a Karnal court, alleging domestic violence, sexual violence, verbal and emotional abuse, economic violence, and dowry-related violence and requesting permanent custody of A.K., spousal and child support, damages, and an order restraining Father from preventing Mother

and A.K. entry to their Lakewood home. On February 25, 2019, the Karnal court issued a warrant for Father's arrest for failure to appear at a January 5, 2019 hearing.

{¶ 15} On February 28, 2019, Mother moved to dismiss Father's complaint for custody of A.K., arguing that the trial court lacked jurisdiction under R.C. 3127.01, the Uniform Child Custody Jurisdiction Enforcement Act ("UCCJEA"), to make an initial custody determination. Mother argued that because A.K. lived in India for more than six months immediately preceding Father's filing the complaint, India has exclusive jurisdiction under the UCCJEA to determine custody of A.K. On March 18, 2019, Father filed his brief opposing the motion. Father argued that A.K.'s absence from Ohio was meant to be temporary and prolonged only by Mother's refusal to return A.K. to Ohio, which constituted "unjustifiable conduct" under R.C. 3127.22. Father alleged that he could not act sooner because he faced arrest if he returned to India and had no enforcement mechanism to require A.K.'s return to Ohio because India is not a member of the 1980 Hague Convention on the Civil Aspects of International Child Abduction. Father argued that A.K. has a significant connection to Ohio, where there is substantial evidence of his care. Father also disputed whether the action Mother filed on February 22, 2019, qualified as a custody proceeding because Father alleged that he had not been served with the complaint and argued that the case did not concern parental rights and responsibilities.

{¶ 16} On March 19, 2019, the trial court ordered Mother to deliver A.K.'s passport to the court. Mother complied with the order but objected to it on the basis

that the court lacked jurisdiction. On April 26, 2019, Father moved for temporary allocation of parental rights and responsibilities, which the trial court granted on May 1, 2019. On May 13, 2019, Mother moved to set aside the order, again based on the court's lack of jurisdiction.

{¶ 17} On July 8, 2019, while Father awaited Mother's arrival at the location they had arranged to exchange A.K. in accordance with the court's temporary shared parenting order, Mother informed Father by email that she left Ohio for India and requested that Father take care of A.K. in her absence. On July 16, 2019, Mother requested a restraining order preventing Father from posting revealing photos of Mother to the internet. Mother alleged that on July 5, 2019, Father threatened to post these photos if she did not leave the country and abandon her defense of the Ohio divorce proceeding and the proceedings she had initiated in India. The trial court granted Mother's request the following day.

{¶ 18} Mother's motion to dismiss for lack of subject-matter jurisdiction was heard before a magistrate on August 13, August 26, August 30, and September 11, 2019. Father testified in person. All other witnesses, including Mother, testified by video conference from India. On October 22, 2019, the magistrate issued his decision, granting Mother's motion to dismiss based on the following findings of fact:

> Sometime after the parties left the airport in Cleveland for [Father's] sister's wedding, [Father] told [Mother] he no longer desired to remain married to her, and revoked [Mother's] invitation to his sister's wedding, as well as any invitations previously offered to [Mother's] family.

[Mother] originally intended to travel to [Father's] family home as a family with [A.K.] upon their arrival to India * * * but was forced to change plans and instead return to her family home with her parents and her father's driving companion due to [Father's] actions and words.

[Father's] actions caused [Mother] and her family a great deal of upset, embarrassment, and shame, so much so that despite the turmoil and pain [Father] caused when he abandoned [Mother] and [A.K.] at the airport in India, she nonetheless wanted to remain married to and living with him in the United States.

[Mother] and a traveling entourage, including her child and parents, traveled to [Father's] home the day before the wedding to attempt to patch things up between the parties and their respective families, and in the hopes of attending both the "Ladies Sangeet" and the wedding to avoid shame and embarrassment. Once they arrived, [Mother] and her family were met with anger, ridicule and vitriol, and at a minimum some form of physical rebuke. Clearly, [Father] was not receptive to reunification with [Mother] and [A.K.]

[Mother] returned to her Indian home with her family, and both sides subsequently utilized the Indian court system to protect their respective rights.

Clandestinely, [Father] left India and returned to the United States on March 10, 2018, without [Mother] or [A.K.] because he believed he could be arrested in the near future, which could have cost him his job in the United States. Although the return flights for [Father], [Mother,] and [A.K.] were all originally booked together and although all three were scheduled to return on the same flight on the same date, [Father] secretly rescheduled only *his* return flight so that he could fly home alone. [Father] left [Mother] and [A.K.] in India, deliberately and by choice.

[Father] testified when he abandoned [Mother] and [A.K.] in India, no law enforcement agency had issued any warrants for his arrest.

In time, and through the Indian court system, the parties and their families, respectively, negotiated a global resolution to the court cases they had filed against each other as a result of the incidents described above. The chief agreement they reached obligated [Father] to travel back to India before April 20, 2018 to retrieve [Mother] and [A.K.] so that they could all fly back to the United States. Although the parties

were not physically present when this agreement was made, they both were involved in the negotiations, and both were aware of what was being discussed and of the agreement that was ultimately reached. Clearly, [Father] understood his obligations under the "Family Compromise."

[Father] *never* returned to India to retrieve [Mother] and [A.K.] in violation of the Family Compromise that had been reached. Through text messages, [Father] promised he would do so on future dates, yet it simply never happened. For several extended periods of time, [Father] had no communication with [Mother] or [A.K.], including between June and October 2018, and between November 2018 and February 2019. [Father] admitted this fact during his testimony.

When [Mother] returned to the United States in February 2019 to investigate [Father's] lack of communication with her and/or his lack of involvement in the lives of [Mother] and [A.K.] (including a complete failure to support either [Mother] or [A.K.] financially), she was served with a copy of the Complaint for Divorce in this case.

(Emphasis sic.)

{¶ 19} The magistrate found the testimony of Mother and her witnesses more credible than that of Father and his witnesses "under the totality of the circumstances." The magistrate rejected Father's argument that the year Mother and A.K. had spent in India was temporary based on Father's statement that he no longer wished to remain married to Mother and on Father's decision to return to the United States alone, leaving Mother and A.K. in India. Based on this and other evidence presented at the motion hearings, the magistrate concluded that A.K.'s home state was India pursuant to R.C. 3127.01(B) and 3127.15.

{¶ 20} Father filed preliminary and supplemental objections to the magistrate's findings of fact and conclusions of law on November 6, 2019, and January 17, 2020, respectively. On November 6, 2019, the trial court issued an

interim order adopting the magistrate's October 22, 2019 decision and partially dissolving the February 5, 2019 order restraining Mother from removing A.K. from Ohio. Father appealed this interim order on November 25, 2019, which this court dismissed on December 12, 2019, for lack of a final appealable order.

{¶ 21} On June 24, 2020, the trial court overruled Father's supplemental objections, adopted the magistrate's October 22, 2019 decision in its entirety, and granted Mother's motion to dismiss for lack of jurisdiction on the issue of custody. The trial court found that A.K. was physically absent from Ohio from March 2018 to February 2019, this nearly yearlong absence did not qualify as "temporary," and Father failed to show "unjustifiable conduct" by Mother. The trial court rejected Father's objections as stemming from a misplaced focus on the parties' intent instead of where A.K. had lived during the relevant time period.

{¶ 22} Father now appeals and assigns the following sole error for review:

### Assignment of Error

The trial court committed reversible error by granting the Motion to Dismiss because the trial court had subject-matter jurisdiction to make an initial child custody determination under ORC Chapter 3127, the Uniform[ ] Child Custody Jurisdiction Enforcement Act ("UCCJEA").

## II. Law and Analysis

{¶ 23} Generally, an appellate court reviews a trial court's child custody determination for an abuse of discretion. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). However, an appellate court reviews a determination relating to subject-matter jurisdiction de novo because such a determination is a matter of law. *In re A.G.*, 8th Dist. Cuyahoga Nos. 100783 and 100912, 2014-Ohio-2776, ¶ 9;

*France v. France*, 8th Dist. Cuyahoga Nos. 95629 and 95729, 2011-Ohio-2402, ¶ 6, citing *Boutros v. Noffsinger*, 8th Dist. Cuyahoga No. 91446, 2009-Ohio-740, ¶ 12 (dismissal for lack of subject-matter jurisdiction under Civ.R. 12(B)(1) is reviewed de novo).

{¶ 24} Under R.C. 3127.15(A), an Ohio court has jurisdiction to make an initial child custody determination "only if one of the following applies":

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

(2) A court of another state does not have jurisdiction under division (A)(1) of this section or a court of the home state of the child has declined to exercise jurisdiction on the basis that this state is the more appropriate forum under section 3127.21 or 3127.22 of the Revised Code, or a similar statute of the other state, and both of the following are the case:

(a) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

(b) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

(3) All courts having jurisdiction under division (A)(1) or (2) of this section have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 3127.21 or 3127.22 of the Revised Code or a similar statute enacted by another state.

(4) No court of any other state would have jurisdiction under the criteria specified in division (A)(1), (2), or (3) of this section.

R.C. 3127.15(B) provides that R.C. 3127.15(A), codifying the UCCJEA, is an Ohio court's "exclusive jurisdictional basis for making a child custody determination." *Rosen v. Celebrezze*, 117 Ohio St.3d 241, 2008-Ohio-853, 883 N.E.2d 420, ¶ 44.

{¶ 25} As codified in Ohio, then, the UCCJEA provides four bases for initial child custody jurisdiction: (1) home-state jurisdiction, (2) significant-connection jurisdiction, (3) jurisdiction based on another court's declination of jurisdiction, and (4) default jurisdiction. *Id.* at ¶ 31. Once home-state jurisdiction is established under R.C. 3127.15(A)(1), significant-connection jurisdiction under R.C. 3127.15(A)(2) is inapplicable. *Id.* at ¶ 42. Any statutory conflict in the application of home-state jurisdiction should be resolved "'in a manner consistent with the UCCJEA's intent of strengthening the certainty of home state jurisdiction.'" *Id.* at ¶ 38, quoting *Stephens v. Fourth Judicial Dist. Court*, 331 Mont. 40, 2006 MT 21, 128 P.3d 1026, ¶ 12.

{¶ 26} "'Home state' means the state in which a child lived with a parent * * * for at least six consecutive months immediately preceding the commencement of the child custody proceeding." *Id.* at ¶ 31, quoting R.C. 3127.01(B)(7). This period of six consecutive months includes not only the six-month period immediately preceding commencement of the child custody proceeding, but also a period of six consecutive months that ends within the six months preceding commencement of the child custody proceeding. *In re E.G.*, 8th Dist. Cuyahoga No. 98652, 2013-Ohio-495, ¶ 14, citing *Rosen* at ¶ 41-42. "Commencement" means "the filing of the first pleading in the proceeding." R.C. 3127.01(B)(5). A period of temporary absence

during the six consecutive months is counted as part of the six-month period. *In re H.P.*, 8th Dist. Cuyahoga No. 101781, 2015-Ohio-1309, ¶ 19, quoting R.C. 3127.01(B)(7). A foreign country is treated as if it were a state of the United States. R.C. 3127.04(A).

{¶ 27} Father argues that A.K.'s stay in India was only temporary. Father contends that the parties and A.K. traveled to India to attend Father's sister's wedding and that the trip had definite beginning and end dates. The family was to remain in India from February 22, 2018, through March 18, 2018, and then return to Ohio. Father claims that he purchased roundtrip tickets and obtained a two-month visitor's visa for A.K. because the parties intended to return to Ohio. Father claims that the trial court placed too much weight on testimony that the parties had argued at the Delhi airport and maintains that Mother's intent to return to Ohio remained consistent from March 2018 through February 2019. Father points to the parties' February 2018 trip to Chennai for visa stamping so that they could return to the United States, Mother's hope that Father would return to India following his March 10 departure so that could they return to Ohio as a family, and Mother's actual return to Ohio with A.K. and Maternal Grandmother in February 2019. Father also maintains that the families on both sides tried to reunite the parties during the family compromise and Maternal Grandparents sought to return Mother and A.K. to Ohio throughout 2018.

{¶ 28} This court has long recognized that the definition of "home state" under R.C. 3127.01(B)(7) requires that any period of temporary absence be counted

as "part" of the six-month period that the child lived in the contested home state but that the statute does not define the term "temporary absence." *In re E.G.* at ¶ 22. This court also recognizes that other jurisdictions have used three different tests to determine whether absences from the contested home state are temporary or permanent: (1) the duration test, (2) the intent test, and (3) the totality of the circumstances test. *Bradshaw v. Pelley-Whelan*, 2019 UT App 201, 456 P.3d 765, ¶ 17, fn. 7, citing *Garba v. Ndiaye*, 227 Md.App. 162, 172, 132 A.3d 908 (2016), and Andrea Charlow, *There's No Place Like Home: Temporary Absences in the UCCJEA Home State*, 28 J. Am. Acad. Matrim. Law 25, 30-37 (2015).

{¶ 29} Under the duration test, a court examines the length of the absence to determine whether it is temporary. Under this test, short absences are generally considered temporary and longer absences are considered permanent. *In re E.G.*, 2013-Ohio-495, at ¶ 22 ("common sense dictates that the plain meaning of 'temporary absence' is leaving the state for short, limited time periods [so that if a child leaves] Ohio for six months or more — half of the year — that does not equate to a short, limited absence"); *see In re Parenting of B.K.*, 392 Mont. 426, 2018 MT 217, 425 P.3d 703, ¶ 28 ("Implicit in [the] requirement [that a period of temporary absence be counted as part of the six-month period for determining home-state jurisdiction] is the concept that a 'temporary absence' cannot be longer than the 'period' and still be a 'part' of that period—a 'temporary absence' cannot be longer than the entire six months immediately preceding the child custody proceeding"). Compared to the other two tests, duration offers a relatively bright-line that is

consistent with the UCCJEA's goals of preventing child abduction and forum shopping and strengthening the certainty of home state jurisdiction. *See* Charlow, 28 J. Am. Acad. Matrim. Law at 44 ("the test for temporary absence needs to be clear and simple[; t]he use of intent in any test raises too many problems to be reliable"); *Rosen*, 117 Ohio St.3d 241, 2008-Ohio-853, 883 N.E.2d 420, at ¶ 38, citing *Stephens*, 331 Mont. 40, 2006 MT 21, 128 P.3d 1026, at ¶ 12.

{¶ 30} Under the intent test, a court examines the purpose of an absence to determine whether it is temporary. The intent test raises several problems: intent has a subjective element "not easily identified through objective evidence or the conflicting testimony of the parties"; the parties can use intent to exceed the six-month statutory period; the parties may disagree about their intentions or their intentions may change over time; the parties may have differing views about the nature of the absence, which makes it difficult to determine which party's intent controls; one party may deliberately conceal his or her intent to deceive the other party. Charlow, 28 J. Am. Acad. Matrim. Law at 31-32, 40-41. "Courts have [also] pointed out that the UCCJEA refers to the place the child 'lived' rather than 'domicile' in order to avoid the uncertainty that accompanies the use of intent to determine home state." Charlow, 28 J. Am. Acad. Matrim. Law at 41, citing, *Slay v. Calhoun*, 332 Ga.App. 335, 340, 772 S.E.2d 425 (2015) ("'home state' is not synonymous with the 'residence or domicile of the parent having legal custody'").

{¶ 31} Finally, as implied by its name, under the totality of the circumstances test, a court examines all of the circumstances, including the duration of the absence

and the parties' intentions concerning the absence, to determine whether it is temporary. Although the totality of circumstances test permits a court to analyze a number of different factors, thereby giving it greater flexibility and discretion to determine home-state jurisdiction, such "[f]lexibility and discretion do not create a definite and certain jurisdiction." Charlow, 28 J. Am. Acad. Matrim. Law at 41. Further, insofar as it incorporates the intent test into the analysis, the totality of circumstances test suffers from the same problems as the intent test, chief of which is uncertainty, thereby conflicting with the purposes of the UCCJEA.

{¶ 32} Therefore, while other jurisdictions have considered the parties' intent as a factor when determining whether an absence from the home state is temporary, neither the Ohio Supreme Court nor this court has expressly adopted intent as a factor, much less the predominant factor, for making this determination. Ohio courts look primarily to the duration of the absence to determine whether it is temporary. *See, e.g., In re B.P.*, 11th Dist. Trumbull No. 2011-T-0032, 2011-Ohio-2334, ¶ 79-81 (rejecting intent as irrelevant to the question of whether an absence is temporary).

{¶ 33} Here, Father points entirely to intent to support his argument that A.K.'s nearly yearlong absence from Ohio was only temporary — that the parties intended to return with A.K. on March 18, 2018; that this intention is evidenced by their round trip tickets, A.K.'s two-month visitor's visa, and the parties' trip to Chennai for visa stamping; that the purpose of the March 25, 2018 family compromise was that Father would return to India by April 20, 2018, and escort his

family back to Ohio; and that Mother and Maternal Grandparents remained hopeful that Mother and A.K. would return to the United States.

{¶ 34} As the trial court explained in its June 24, 2020 opinion, Father's focus on the parties' intentions is misplaced.[1] Father departed India alone on March 10, 2018, leaving Mother and A.K. behind. For nearly a year, from March

---

[1] The trial court determined that the year Mother and A.K. lived in India before Father filed the child custody complaint was dispositive of the question of home-state jurisdiction. In adopting the magistrate's October 22, 2019 decision in its entirety, however, the trial court incorporated the magistrate's totality of circumstances analysis into its opinion. The record reveals that during the hearing, the parties were thoroughly questioned about their intentions.

Counsel for Mother asked Mother about her intention to travel with Father and A.K. to Father's family home in Kapurthala after they landed in Delhi, her intention to attend the wedding when she subsequently traveled to Kapurthala with Maternal Grandparents and A.K., and whether she thought Father intended to return to India after he left for the United States alone.

Counsel for Father repeatedly asked Mother about her intention to return to Ohio after the wedding, after visa stamping, after the family compromise, and after she filed a domestic violence complaint against Father. Counsel for Father also asked Mother whether it was her intention to keep A.K. in India indefinitely or move back into the parties' Lakewood condominium after she returned to Ohio with A.K. in February 2019.

The magistrate extensively questioned Father whether he actually intended to return to India on April 20, 2018, in accordance with the family compromise, or whether he did not plan to return because he feared that he might be arrested.

Therefore, even if the parties' intentions were relevant, the hearing transcripts and magistrate's findings of fact and conclusions of law show that the trial court fully considered the parties' intentions and found Mother the more credible party.

An appellate court should generally defer to the trial court on matters of credibility, and such deference "is even more crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). Because trial courts consider credibility when determining the parties' intentions, the duration that a party lived with a child in the home state presents the more legitimate ground for reversal.

2018 to February 2019, Father lived in Ohio, and Mother and A.K. lived in India. On February 5, 2019, shortly after Mother and A.K. returned to Ohio, Father filed his complaint for custody of A.K. in Ohio. On February 22, 2019, less than a month after arriving in Ohio, Mother, through counsel, petitioned for permanent custody of A.K. in India. Because India was the place where Mother and A.K. lived for more than six consecutive months within the six-month period preceding Father's commencement of custody proceedings in Ohio, India has home-state jurisdiction under R.C. 3127.15(A)(1). *In re E.G.*, 2013-Ohio-495, at ¶ 14, citing *Rosen*, 117 Ohio St.3d 241, 2008-Ohio-853, 883 N.E.2d 420, at ¶ 41-42.

{¶ 35} Father also argues that the trial court had two other bases for jurisdiction under R.C. 3127.15(A)(2) and 3127.15(A)(4) because Mother engaged in "unjustifiable conduct" under R.C. 3127.22 by retaining A.K. in India. Father admits that declination jurisdiction under R.C. 3127.15(A)(3) does not apply. Father also admits that significant-connection jurisdiction under R.C. 3127.15(A)(2) and default jurisdiction under R.C. 3127.15(A)(4) only apply if there is no home state under R.C. 3127.15(A)(1). Father argues instead that India cannot have home-state jurisdiction because R.C. 3127.22 prevents India from exercising jurisdiction based on Mother's establishing jurisdiction in India by wrongfully keeping A.K. there for almost a year. Father maintains that the trial court "misconstrued" Father's argument when it stated that R.C. 3127.22 prevents Ohio from exercising jurisdiction when Father was applying the statute to India. Father claims that "[i]f the UCCJEA prevents a parent from creating jurisdiction in Ohio due to unjustifiable conduct, the inverse must also

be true:  the law must also prevent [Mother] from creating jurisdiction in another state due to her unjustifiable conduct."

{¶ 36} R.C. 3127.22(A) provides that an Ohio court shall decline to exercise jurisdiction if "a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct."  "Unjustifiable conduct" means conduct by a parent in an attempt to create jurisdiction in Ohio by "removing the child from the child's home state, secreting the child, retaining the child, or restraining or otherwise preventing the child from returning to the child's home state in order to prevent the other parent from commencing a child custody proceeding in the child's home state." R.C. 3127.22(D).

{¶ 37} Father first relies on *Wheeler v. Gadegbeku*, 2d Dist. Montgomery No. 25017, 2012-Ohio-1629, to support his contention that the India court must decline jurisdiction if it is based on unjustifiable conduct or, alternatively, the trial court in Ohio should exercise jurisdiction if India's jurisdiction is based on unjustifiable conduct. *Wheeler* is inapposite, however.  In *Wheeler*, the mother filed a custody petition in an Ohio court challenging a custody determination made by a Michigan court and arguing that the father had invoked the Michigan court's jurisdiction by unjustified conduct when he removed the child to Michigan without the mother's permission.  The Ohio court then issued a conflicting custody determination, ordering the child to be returned to the mother.  The appellate court rejected the mother's jurisdictional argument, finding that

> R.C. 3127.22 governs the effect of unjustifiable conduct upon the jurisdiction of an Ohio court. * * * This is not a situation where either party has invoked the Ohio court's jurisdiction by engaging in unjustifiable conduct. Instead, by finding that it has home-state jurisdiction, the [trial] court's order presumes that [the father] improperly, and with unjustifiable conduct, invoked the jurisdiction of the Michigan family court, thereby nullifying the effect of its custody determination.

*Id.* at ¶ 12. Here, the Indian court where Mother has petitioned for custody of A.K. has not made a custody determination that Father seeks to nullify by alleging that Mother invoked the Indian court's jurisdiction by unjustifiable conduct. More to the point, however, is the *Wheeler* Court's recognition that "R.C. 3127.22 governs the effect of unjustifiable conduct upon the jurisdiction of an *Ohio* court." (Emphasis added.) *Id.* Because Mother has not invoked an Ohio court's jurisdiction by unjustifiable conduct, R.C. 3127.22 does not apply.

{¶ 38} Father next relies on *Mulatu v. Girsha*, 12th Dist. Clermont No. CA2011-07-051, 2011-Ohio-6226, to support his contention that India's jurisdiction is not proper if it is based on Mother's wrongfully extending her and A.K.'s stay in India. In *Mulatu*, the father, mother, and children lived together in Ohio for a year. The family traveled to Ethiopia to visit the mother's parents, where the father abandoned the family, taking the children's passports with him and leaving the mother with no legal means to return to Ohio with the children. The mother subsequently returned to Ohio and commenced child custody proceedings. The trial court determined that it was without jurisdiction because of the children's absence from the state. The appellate court reversed, finding that the father could not avoid

significant-connection jurisdiction under R.C. 3127.15(A)(2) by withholding the children's passports so that they could not return to Ohio. The court concluded that there was significant-connection jurisdiction because there was no basis for home state jurisdiction either in Ohio or in Ethiopia. The children had been living in Ethiopia, not Ohio, for six consecutive months, but they had not been living with the parents or with those acting as parents as required by R.C. 3127.15(A)(1).

{¶ 39} Here, the record does not show that Mother wrongfully delayed returning to Ohio with A.K. simply to create jurisdiction in India. First, Father argues that Mother chose not to board her return flight on March 18, 2018, yet Father already departed India more than a week earlier than scheduled, leaving Mother and A.K. behind because the parties were then still at odds. Father next argues that he left India on March 10 because he feared arrest and confiscation of his passport following the criminal complaint Maternal Grandfather filed on Mother's behalf, but there is no evidence in the record showing that an arrest warrant was issued for Father based on the March 8, 2018 complaint. The only arrest warrant in the record follows Father's failure to appear in January 2019 to answer the charges in Mother's November 22, 2018 complaint. Father also argues that on March 24, 2018, Mother sought to extend A.K.'s visa for 18 years to remain in India, received a year extension, and only returned to Ohio in February 2019, because A.K.'s visa was expiring. Mother requested this extension, however, before the family compromise was reached on March 25, 2018, after which the families dismissed their criminal complaints against each other and agreed that Father

would return to India to retrieve his family by April 20, 2018. Further, when Mother did return to Ohio in February 2019, she found that Father had the locks of their condominium changed. Finally, Father argues that he was not a party to the compromise and that it is nonbinding and without legal effect, which not only explains why Father did not feel obliged to return to India by April 20, 2018, but also explains why Mother thereafter delayed her return to Ohio because Father continued to tell Mother that he would return to India but never did.

{¶ 40} Therefore, even if R.C. 3127.22 applied to the facts in this case, there is no evidence in the record showing that Mother engaged in unjustifiable conduct to create jurisdiction in India.

{¶ 41} Therefore, India has home-state jurisdiction to make the initial custody determination of A.K.

{¶ 42} Accordingly, we overrule the sole assignment of error.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY J. BOYLE, J., CONCUR